**HOFFMANN–LA ROCHE INC.,**
**a/k/a "Roche," Petitioner**

**v.**

**Joan ZELTWANGER, a/k/a Joan**
**Gonzales, Respondent.**

No. 02–0120.

Supreme Court of Texas.

Argued Feb. 5, 2003.

Decided Aug. 27, 2004.

---

Melissa Essary, Waco, Lane Transou, The Woodlands Michael W. Fox, Haynes and Boone, Austin, W. Carl Jordan, Houston, for Amicus Curiae.

Thomas F. Loose, Phillip R. Jones, Cynthia Keely Timms, Michael V. Powell, Locke Liddell & Sapp LLP, Dallas, Harvey G. Joseph, Law Offices of Harvey G. Joseph, Allan G. King, Dallas, and Russell H. McMains, Law Offices of Russell H. McMains, Corpus Christi, Shannon Cameron and Stuart M. Reynolds Jr., Winstead Sechrest & Minick, Dallas, for Petitioner.

Charles T. Frazier Jr., Cowles & Thompson, P.C., Tim Gavin, Jeffrey S.

Levinger and Stephanie Dooley Nelson, Carrington Coleman Sloman & Blumenthal, L.L.P., G. Michael Gruber, Brian N. Hail, Godwin Gruber, P.C., Dallas, for Respondent.

Chief Justice PHILLIPS delivered the opinion of the Court in which Justice HECHT, Justice OWEN, Justice JEFFERSON, Justice WAINWRIGHT and Justice BRISTER joined.

We must decide whether a plaintiff can recover damages on a claim for intentional infliction of emotional distress when the Legislature has created a statutory right to seek emotional damages for the same actions that form the basis of the intentional-infliction claim. The court of appeals concluded that the plaintiff could recover damages under both claims, electing mental anguish and punitive damages under her intentional-infliction claim while taking other compensatory damages and attorney's fees under her sexual harassment claim. 69 S.W.3d 634. We conclude that when the gravamen of the plaintiff's complaint is for sexual harassment, the plaintiff must proceed solely under a statutory claim unless there are additional facts, unrelated to sexual harassment, to support an independent tort claim for intentional infliction of emotional distress. We therefore reverse the judgment of the court of appeals and remand the cause to the trial court for rendition of judgment consistent with this opinion.

I

Joan Zeltwanger [1] sued her former employer, Hoffmann La–Roche, Inc. ("Roche"), for sexual harassment under Texas Labor Code section 21.051, retaliation under Texas Labor Code section 21.055, and intentional infliction of emo-

---

1. After filing this lawsuit, Zeltwanger married and changed her name to Gonzales but ap-
parently did not ask that the style of the case be changed.

tional distress.[2] Zeltwanger also sued Jim Webber, her supervisor at Roche, for intentional infliction of emotional distress.

Except for the retaliation claim, Zeltwanger prevailed at trial on all of her claims against Roche and Webber. Against Webber, who is not a party to this appeal, she obtained a judgment in the amount of $50,160 for intentional infliction of emotional distress. On her sexual harassment claim against Roche, the jury awarded Zeltwanger $835,963 for front and back pay, $500,000 in compensatory damages, and an additional $8,000,000 in punitive damages. On the intentional infliction of emotional distress claim against Roche, the jury awarded $1,000,000 for mental anguish, $73,000 for past and future medical care, and another $8,000,000 in punitive damages. Acknowledging potential double recovery and applicable statutory cap[3] considerations with respect to the $500,000 in compensatory and the $8,000,000 in punitive damages of the harassment award, Zeltwanger moved to limit her harassment damages to front and back pay and attorney's fees while taking her mental anguish and punitive damages under her intentional-infliction claim. The trial court therefore rendered judgment awarding Zeltwanger $847,036 on her harassment claim, comprising front and back pay adjusted for disability payments and interest. Judgment on the intentional infliction of emotional distress claim against Roche, which

at that time was not subject to a statutory cap,[4] amounted to $9,504,706, adjusted for interest. The court of appeals affirmed these awards, and Roche appeals only the intentional infliction of emotional distress claim.

## II

Zeltwanger began working in November 1990 as a sales representative for Roche, a pharmaceutical company. In this capacity, Zeltwanger worked out of her home, as did other Roche sales representatives. Roche, like many pharmaceutical sales companies, did not maintain regional offices, instead running its nationwide operations solely from its New Jersey corporate headquarters.

Until 1992, Zeltwanger worked under Dallas-based sales manager Betty Turicchi. When Turicchi became a Roche supervisor in another region, Webber, a Dallas-based division sales manager, became Zeltwanger's supervisor. Zeltwanger testified that Webber began telling dirty jokes in front of her in the last half of 1992, three or four months after Zeltwanger moved into his division, and went on to engage in other objectionable conduct.

Zeltwanger discussed Webber's behavior with Turicchi on several occasions. Turicchi, Zeltwanger says, gave her pointers on how to handle Webber and "document everything that was happening" but warned

---

2. These provisions of the Labor Code were enacted as part of the Texas Commission on Human Rights Act. *See* Act of June 25, 1983, 68th Leg., 1st C.S., ch.7, § 46 cmt § 46 cmt 1.01–10.07, 1983 Tex. Gen. Laws 37–58 (current version at Tex. Lab.Code § 46 cmt § 46 cmt 21.001–.306).

3. In suits against corporations such as Roche that have more than 500 employees, section 21.2585 of the Texas Labor Code caps at $300,000 the sum of the amount of compensatory damages that may be awarded for future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, as well as the amount of punitive damages awarded.

4. Texas Civil Practice and Remedies Code section 41.008; which provides a limit on certain punitive damage awards, applies only to actions accruing on or after September 1, 1995. *See* Act of April 20, 1995, 74th R.S., ch. 19, § 46 cmt 2, 1995 Tex. Gen. Laws 108, 113.

her that making a claim of sexual harassment within the company would jeopardize Zeltwanger's chances of advancement. Subsequently, Turicchi advised Zeltwanger that she would need to contact Roche human resources representative Betty DeVos in order to make a formal complaint.

Zeltwanger eventually did contact DeVos, and on August 19, 1994, she faxed a handwritten, five-page statement to her, which made the following complaints about Webber:

1. Last fall at Div Mtgs with Zore—during Rocephin game. I won a question & he delivered my $5 between his teeth to me stating & you've implied you've never been to those top-less bars in front of 2 work groups. Betty Turrichi witnessed this at meeting. Her division or group was there also.

2. At Dir Mtg last fall—told dirty jokes & talked about top-less dancers. I told him I do not like jokes like that & did not want to hear them.

3. Talked about his car name was in college & that they used to have sex or "do it" in the car.

4. Last summer field trip—continually tells dirty & inappropriate jokes—verbalized to me the sorority girls "he screwed" in college the couples they (him & his wife) still hang around & his goal to "do them" all while standing at the trunk of my car. I responded with "I don't want to hear this."

5. Had lunch last Summer/Spring with my Arl. Memorial Hospital Anesthesia & Jim made a comment to those physicians that I was not the typical homely Betty Turicchi hire & he thought it was a joke when I walked into Bennigans for a confirming interview. Their (the Drs.') reply was—what is a typical Betty Turicchi hire? Jim's reply was they don't have legs & a body like that. I was

standing outside of the room & heard this as I entered back into the room.

6. Told a Howard Stern panty (underwear) story from a concert his daughter attended—ask me if I was wearing panties. This story was told in one of my GI offices as I set up a teleconference last spring.

Despite my protest he continued as follows:

7. Last winter while on field trip Jim made inappropriate references to his body parts i.e. "his ding dong" & how when he was in school he whipped it out in class. I told him I did not want to hear it.

8. Last winter while on field trip Jim made reference to my having a bad hair day & flung my hair by touching it in front of one of my hospital pharmacists. Before this call I was lectured about going & "kicking some ass" with this RPH & telling him what a liar he is for publishing a newsletter at hospital. He continually disregards my credibility & work involved with the BID dosing problem at this hospital. To which the situation attempts have been with in converting BID to QID dosing of Rocephin.

9. Last month on field trips as on previous others he continually mentions & alludes to his sexual encounters & sex positions (on his back) while screwing this girl who lived in these apartments as we pass the apartments. I advised him at the time I don't want to hear this.

10. Last Dec. when Jim Webber came to my house to check samples I was in my office filling out a form. When I was finished I found him in my bedroom. When I ask him what he was doing & to get out of my bedroom he said he was trying to find my stereo.

There will be more to follow as I continue to compile a list.

On August 24, 1994, Webber conducted a regularly-scheduled performance review of Zeltwanger, which Zeltwanger and Turricchi attended. Zeltwanger testified that Webber "screamed and yelled" at her and repeatedly criticized her job performance during this review. Turicchi testified that the discussion at the review focused on Zeltwanger's job performance, particularly her sales skills, and that Zeltwanger disagreed with Webber's assessment of her performance. In his written evaluation based on the review, Webber gave Zeltwanger an "H" rating, a below average designation that signifies the employee is "meeting most" of the standards but needs to make improvements. Shortly after this review, Roche completed its investigation of Zeltwanger's complaint and terminated Webber because of his inappropriate behavior with Zeltwanger.

At the end of 1994, Zeltwanger received notification that Roche had fired her also. Shortly thereafter, she filed a complaint for sexual harassment against Roche with the Texas Commission on Human Rights. Under the section entitled "Discrimination Statement," she stated:

I believe that I have been discriminated against, in violation of the Texas Commission on Human Rights Act, as amended, and Title VII of the Civil Rights Act of 1964, as amended, because of my sex, female (sexual harassment), inasmuch as:

Background: Jim Webber's reflections and references to his sexual exploits, and matters of a sexual nature, became non-stop and always managed to get personal. Some examples of this intolerable behavior are:

—On a field trip in early Winter 1993, Mr. Webber made inappropriate remarks about his body parts, i.e., "his ding-dong" and remarked that in school, in class, he used to "whip it out". On the same trip, Mr. Webber belittled me by flinging my hair and referring to a "bad hair day" in front of my hospital pharmacists.

—On a later trip, in December 1993, Mr. Webber described sexual encounters and his preferred position when "screwing this girl who lives in those apartments", as we passed an apartment complex.

—Mr. Webber also invaded my privacy by entering my bedroom when he came to my home to inspect samples.

—In early 1994, at several division meetings, Mr. Webber spoke of topless bars and told offensive, obscene jokes.

—In Spring 1994, Mr. Webber asked if I was wearing panties. This was also repeated to physicians in one of the offices while I set up for a teleconference.

—In spring/summer 1994, I overheard Mr. Webber telling physicians that I "was not the typical homely hire" and "they don't have legs and a body like that!"

—In mid summer 1994 on a field trip, Mr. Webber continually told lewd and smutty jokes. He mentioned the sorority girls "he screwed" in college. He also stated that his goal was to "do it" while standing at the trunk of his car.

A. I repeatedly rebuffed Mr. Webber for his behavior but this only made matters worse. My work environment was intolerable.

B. Due to Mr. Webber's hostility and vindictiveness, I requested that a third impartial party be present at my review in early August 1994. His behavior was unbearable and my review was unjustly negative. I was forced to seek counseling.

C. I am aware that an internal investigation of Mr. Webber's behavior found

that the harassment allegations had "merit."

Zeltwanger's complaints have remained largely unchanged throughout this litigation, although at trial she added that she once caught Webber going through her underwear drawer, not merely that he had entered her bedroom without permission. Zeltwanger explained at trial that she maintained a home office and that it was standard procedure for her supervisor to come to her home to take an inventory of her pharmaceutical samples. During one such inventory, Webber wandered into her bedroom and went through her underwear drawer. Zeltwanger also offered medical testimony at trial that she experienced symptoms of depression and partial disability as a result of the alleged conduct.

III

■ To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Standard Fruit & Vegetable Co. v. Johnson,* 985 S.W.2d 62, 65 (Tex. 1998). Extreme and outrageous conduct is conduct " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993) (quoting Restatement (Second) of Torts § 46 cmt 46 cmt. d (1965)). Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 612 (Tex.1999); Restatement (Second) of Torts § 46 cmt 46 cmt. d (1965). It is for the court to determine, in the first instance, whether a defendant's conduct was extreme and outrageous. *GTE Southwest, Inc.,* 998 S.W.2d at 616; Restatement (Second) of Torts § 46 cmt 46 cmt. h. But when reasonable minds may differ, it is for the jury, subject to the court's control, to determine whether, in the particular case, the conduct was sufficiently extreme and outrageous to result in liability. *GTE Southwest, Inc.,* 998 S.W.2d at 616; Restatement (Second) of Torts § 46 cmt 46 cmt. h.

■ In addition to her common-law claim for intentional infliction of emotional distress, Zeltwanger sought damages for Roche's violation of the Texas Commission on Human Rights Act (CHRA). This statute prohibits an employer from discriminating against an individual because of race, color, disability, religion, sex, national origin or age. *See* Tex. Lab.Code § 46 cmt 21.051. Sexual harassment[5] is one form of prohibited employment discrimination. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Ewald v. Wornick Family Foods, Corp.,* 878 S.W.2d 653, 658 (Tex.App.-Corpus Christi 1994, writ denied).

■ The CHRA "is modeled after federal law with the purpose of executing the policies set forth in Title VII of the federal Civil Rights Act of 1964." *Green v. Indus. Specialty Contractors, Inc.,* 1 S.W.3d 126, 131 (Tex.App.-Houston [1st Dist.] 1999, no pet.); *see also* Tex. Lab. Code § 46 cmt. 21.001; 42 U.S.C. § 46 cmt

5. Sexual harassment claims generally take either of two forms: (1) quid pro quo harassment, in which employment benefits are conditioned on sexual favors; and (2) harassment that creates a hostile or offensive work environment. *Syndex Corp. v. Dean,* 820 S.W.2d 869, 871 (Tex.App.-Austin 1991, writ denied).

2000e–2 (Civil Rights Act of 1964). As such, federal case law may be cited as authority in cases relating to the Texas Act. *Stinnett v. Williamson County Sheriff's Dep't*, 858 S.W.2d 573, 576 (Tex.App.-Austin 1993, writ denied). The CHRA further establishes a "comprehensive administrative review system," under which the "exhaustion of administrative remedies is a mandatory prerequisite to filing a civil action alleging violations of the CHRA." *Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d 483, 485, 488 (Tex.1991).

In creating causes of action for discrimination, including sexual harassment, both Congress and the Texas Legislature have specified the types and amounts of damages that may be awarded. *See* 42 U.S.C. § 46 cmt 1981a(b)(3); Tex. Lab.Code § 46 cmt 21.2585. The CHRA provides that a court may award compensatory damages upon finding that an employer has engaged in an unlawful intentional employment practice and may further award punitive damages when the discriminatory practice is with malice or reckless indifference. Tex. Lab.Code § 46 cmt 21.2585(a), (b). The Texas Act further caps the award of punitive and compensatory damages on a sliding scale commensurate with the size of the employer. *Id.* § 46 cmt 21.2585(d). The largest employers, like Roche, are subject to a maximum cap of $300,000. *Id.* § 46 cmt 21.2585(d)(4). The compensatory damages which are capped specifically include, among other things, "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *Id.* § 46 cmt 21.2585(d). The cap does not apply to back pay, interest on back pay, and equitable relief. *Id.* § 46 cmt 21.2585(c).

As previously set out, the jury awarded Zeltwanger approximately $8.5 million in damages for mental anguish and punitive damages under her sexual harassment claim and about $9 million for mental anguish and punitive damages under her intentional-infliction claim. Because of the duplication in these awards, the trial court allowed Zeltwanger to take her mental anguish and punitive damages under the intentional-infliction claim, collecting only her front and back pay damages under the statutory claim. Zeltwanger's choice was understandable, as her statutory recovery for these damages was capped at $300,000, while her common-law damages were then uncapped. Thus, by electing to take part of her damages under her common law tort claim, Zeltwanger avoided the effect of the statutory cap.

## IV

Roche complains that Zeltwanger has improperly used the intentional-infliction tort to circumvent the legal limitations on the amount of mental anguish and punitive damages recoverable in a sexual harassment suit. Roche submits that the intentional-infliction tort is a "gap-filler" that only applies under special circumstances when more established torts do not permit recovery. Because the CHRA provided a statutory remedy for essentially the same conduct, Roche submits there was no gap to be filled by the common law and hence no right to an award of further damages against it. Alternatively, Roche contends that if the tort of intentional infliction applies here, the evidence is legally insufficient to satisfy one or more of its elements.

Zeltwanger responds that her intentional infliction and sexual harassment claims were not based entirely upon the same conduct or the same facts. While the actions of Roche through Webber did include extreme and outrageous sexual harassment, Zeltwanger submits that they also included public humiliation, intimidating verbal abuse, threatening gestures, and invasions of Zeltwanger's privacy in her own

home. Furthermore, Zeltwanger contends that Roche's "gap-filler" argument is an appellate afterthought that was neither raised nor preserved in the trial court. Finally, Zeltwanger concludes that the evidence fully supports the jury's finding that Roche intentionally or recklessly caused her severe emotional distress through extreme and outrageous conduct.

### A

Roche's gap-filler argument is based on our decision in *Standard Fruit and Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex.1998). There we recognized that the intentional infliction of emotional distress was, first and foremost, a "gap-filler" tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress. *Id.* The tort's "clear purpose," we noted, was "to supplement existing forms of recovery by providing a cause of action for egregious conduct" that might otherwise go unremedied. *Id.* We cautioned, however, that the tort was "a 'gap-filler' tort that should not be extended to circumvent the limitations placed on the recovery of mental anguish damages under more established tort doctrines." *Id.*

 Likewise, in this case, the tort should not be extended to thwart legislative limitations on statutory claims for mental anguish and punitive damages. By combining her sexual harassment claim with the intentional-infliction tort, Zeltwanger has circumvented, by more than thirty-fold, the legislative determination of the maximum amount that a defendant should pay for this type of conduct. In creating the new tort, we never intended that it be used to evade legislatively-imposed limitations on statutory claims or to

supplant existing common law remedies. Properly cabined, the tort simply has no application when the "actor 'intends to invade some other legally protected interest,' even if emotional distress results." *Id.* at 67 (quoting Restatement (Second) of Torts § 46 cmt 47 cmt. a (1965)); *accord Messick v. Toyota Motor Mfg., Ky., Inc.*, 45 F.Supp.2d 578, 582 (E.D.Ky.1999) (no claim for intentional infliction of emotional distress because plaintiff had an existing form of recovery for emotional distress under civil rights statute); *K.G. v. R.T.R.*, 918 S.W.2d 795, 799 (Mo.1996) (intentional infliction of emotional distress claims "will not lie where the alleged conduct is intended to invade other legally protected interests of the plaintiff"); *McIntyre v. Manhattan Ford, Lincoln–Mercury, Inc.* 256 A.D.2d 269, 682 N.Y.S.2d 167, 169 (N.Y.App.Div.1998) (no reason to apply tort of intentional infliction of emotional distress where an applicable statute expressly provides for emotional distress damages); *Haubry v. Snow*, 106 Wash. App. 666, 31 P.3d 1186, 1193 (2001) ("employee may recover damages of emotional distress ... but only if the factual basis for the claim is distinct from the factual basis for the discrimination claim"). Where the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available. *See, e.g., Provencher v. CVS Pharmacy*, 145 F.3d 5, 12 (1st Cir.1998) (defamation); *Thompson v. Sweet*, 194 F.Supp.2d 97, 103 (N.D.N.Y.2002) (malicious prosecution, false imprisonment); *Norris v. Bangor Publ'g Co.*, 53 F.Supp.2d 495, 508–09 (D.Me.1999) (defamation); *Barker v. Huang*, 610 A.2d 1341, 1351 (Del.1992) (defamation); *Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky.Ct.App.2001) (false imprisonment and assault and battery); *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 316 (Mo.1993) (defamation); *Quaker Petroleum Chems. Co. v. Waldrop*, 75 S.W.3d

549, 555 (Tex.App.-San Antonio 2002, no pet.) (negligence, gross negligence); *Rice v. Janovich,* 109 Wash.2d 48, 742 P.2d 1230, 1238 (1987) (assault). Thus, we need not decide whether, in the absence of a legislative remedy for sexual harassment, the evidence here would be sufficient to support a claim for intentional infliction of emotional distress.

██ In her concurring opinion, Justice O'Neill expresses concern that our gap-filler analysis may lead to unintended consequences such as a larger monetary recovery in tort for plaintiffs who cannot sustain their burden for sexual harassment. She asks: "Does the fact that the plaintiff did not sustain its evidentiary burden on an alternative claim create a gap that intentional-infliction was designed to fill?" She further worries that our analysis may lead to skewed trials in which defendants find it advantageous to confess liability for sexual harassment to avoid more onerous awards under the intentional-infliction tort. In answer to these concerns, we note that a plaintiff's failure to establish his or her claim for sexual harassment does not mean that the plaintiff has a claim for intentional infliction of emotional distress. If the gravamen of a plaintiff's complaint is the type of wrong that the statutory remedy was meant to cover, a plaintiff cannot maintain an intentional infliction claim regardless of whether he or she succeeds on, or even makes, a statutory claim.

B

Zeltwanger contends, however, that she can elect the higher recovery here because independent grounds, apart from sexual harassment, exist for the tort. She argues that there is evidence of additional egregious, but wholly non-sexual, conduct in this case involving public humiliation, verbal oppression, physical threats, invasion of privacy, abuse of power, and mistreatment of an employee known to have been rendered susceptible to emotional distress.

Roche responds that throughout this case Zeltwanger has consistently treated Webber's behavior as a cohesive set of actions that support both her sexual harassment and intentional-infliction claims. None of her mental anguish evidence at trial was separated into one claim or the other, and Roche submits that any such designation would have been artificial in any event. Sexual harassment, Roche points out, often devolves into other forms of abuse and bullying.

While the court of appeals did not differentiate between sexual and non-sexual conduct, it did find the following acts by Roche, taken together, sufficient to constitute extreme and outrageous conduct: (1) Roche "allowed" the development of a corporate culture that permitted vulgar joke-telling; (2) Turicchi failed initially to report to upper management Zeltwanger's discussions with her about Webber's conduct; (3) Roche subjected Zeltwanger to the August 1994 in-person review with Webber after she had formally complained about Webber's conduct and sent Turicchi only as an observer without authority to intervene when Webber verbally abused Zeltwanger during this session; (4) Roche terminated Zeltwanger and caused her to believe this termination was, in part, based on Webber's unfavorable evaluation of her at the August 1994 review; and (5) Roche allowed managers like Webber to function unsupervised in the field (including in cars and homes) with direct responsibility for female employees like Zeltwanger. 69 S.W.3d at 646–47. Even assuming that some or all of this conduct might be considered to be independent of Zeltwanger's sexual harassment claim, an assertion of which we are skeptical but need not de-

cide, it does not rise to the level of extreme or outrageous conduct.

■ First, Zeltwanger's proof that Roche allowed a corporate culture of insensitive jokes relating to women and minorities falls short of constituting extreme and outrageous conduct. Zeltwanger's evidence showed only a handful of instances of off-color jokes being told among Roche employees over a period of several years in a company with 1,000 sales people. Such evidence is legally insufficient to show that Roche fostered a culture that encouraged extreme and outrageous conduct.

■ Second, we conclude that Turicchi's failure to report Zeltwanger's concerns about Webber to others within Roche was not extreme and outrageous. Zeltwanger does not claim that she attempted to file a formal complaint with Turicchi. Moreover, after Zeltwanger talked with Turicchi on several occasions about Webber's conduct, Turicchi told her about DeVos, the appropriate person with whom to file a formal complaint. Finally, Turicchi did not exercise authority over either Zeltwanger or Webber. In sum, Turicchi's failure to take more aggressive action in response to Zeltwanger's concerns about Webber is no evidence of extreme and outrageous conduct on the part of Roche.

■ Third, Zeltwanger's claim that Roche's conduct surrounding her August 1994 performance review with Webber was extreme and outrageous is without merit. Zeltwanger asserts that Roche itself caused her distress by telling Webber in advance that Turicchi would attend her review and by scheduling the review at Webber's home. Her complaint is not that Turicchi was present, but that Webber had several days to prepare for the review knowing that Zeltwanger would not be alone. We do not believe that such notice to a supervisor is in any way extreme or outrageous. Nor is the location of the review given the circumstance that Roche did not have physical offices in Texas. Zeltwanger does not assert that she felt physically imperiled by the prospect of going to Webber's home, especially with Turrichi present.

■ Fourth, Zeltwanger's charge that Roche led her to believe that Webber's performance evaluation of her after this review session was a factor in her termination is not extreme or outrageous. We have held that workplace and employment matters such as "criticism, lack of recognition, and low evaluations" are not actionable, even if they are unpleasant or unfair. *GTE Southwest, Inc.*, 998 S.W.2d at 613. Nothing in this record indicates that Roche did anything more than make an honest error in telling her that the review would be a factor in whether she was retained or terminated.

■ Finally, Zeltwanger's claim that allowing managers to function unsupervised in the field (including in cars and homes) with direct responsibility for female employees is not extreme or outrageous. While it may well have been easier for Webber to engage in his objectionable conduct because he and Zeltwanger worked in the field rather than at a traditional business office, there is no evidence this management structure amounts to a corporate policy endorsing Webber's conduct. Thus, even assuming there is evidence of conduct by Roche which may be considered to be independent of the sexual harassment claim, we conclude that such conduct is not extreme or outrageous as a matter of law.

C

■ Zeltwanger finally argues that Roche failed to raise its "gap-filler" argument in the trial court and thus has waived

the award of damages under the intentional-infliction claim. She submits that Roche did not plead or assert by special exception that this tort was per se unavailable in any case involving statutorily-actionable sexual harassment nor did it object to the jury charge on this basis. But Roche did complain in its motion for judgment non obstante veredicto that intentional infliction was a gap-filler tort that could not be extended to circumvent the limitations placed on the recovery of mental anguish damages. In this motion, Roche specifically urged the limitations set out in *Standard Fruit and Vegetable Co. v. Johnson:*

> [T]he Supreme Court's opinion in *Johnson* explains that the tort's clear purpose is to supplement existing forms of recovery by providing a cause of action for particularly egregious conduct that its more established neighbors in tort doctrine would technically fence out. In short, intentional infliction of emotional distress is a "gap-filler" tort that cannot be extended to circumvent the limitations placed on the recovery of mental anguish damages under more established tort doctrine.

(citations omitted). Because the issue presented a pure legal question which did not affect the jury's role as fact finder, the post-verdict motion was sufficient to preserve error. *See Holland v. Wal–Mart Stores, Inc.,* 1 S.W.3d 91, 94 (Tex.1999) ("no logical reason to treat a post-verdict legal availability challenge differently than a post-verdict legal sufficiency challenge").

\* \* \*

In sum, we do not believe that Zeltwanger's intentional-infliction claim is independent of her sexual harassment claim. Because the CHRA provides a remedy for the same emotional damages caused by essentially the same actions, there is no remedial gap in this case and thus no support for the award of damages under the intentional-infliction claim. Moreover, even were we to consider only that conduct that might arguably form an independent basis for such a claim and indulge every reasonable inference and intendment in favor of such claim, it would still not be sufficient to raise a fact issue. Accordingly, the court of appeals erred in affirming that part of the trial court's judgment awarding damages under the tort theory. We reverse that judgment and remand the cause to the trial court for it to render judgment for the appropriate damages under Zeltwanger's sexual harassment claim.

Justice HECHT filed a concurring opinion.

Justice O'NEILL filed a concurring opinion in which Justice SMITH joined.

Justice SCHNEIDER did not participate in the decision.

Justice HECHT, concurring.

I join the Court's opinion because I agree that the tort of intentional infliction of emotional distress does not lie in circumstances where liability is determined by other torts or by statute since "the tort's clear purpose is to supplement existing forms of recovery by providing a cause of action for egregious conduct 'that its more established neighbors in tort doctrine would technically fence out.' "[1] This is consistent with, and not a departure from, my more fundamental position that the tort of intentional infliction of emotional distress should not exist at all for the reasons I explained eleven years ago in

---

1. *Standard Fruit and Vegetable Co. v. Johnson,* 985 S.W.2d 62, 68 (Tex.1998) (citation omitted).

*Twyman v. Twyman.*[2] Experience since then has done much to prove those reasons correct, but since the Court is not yet ready to throw in the towel, I accept a restriction that seems to have been latent in the thinking that created the tort, as best I have been able to understand it.

I also agree with Justice O'Neill that the facts of this case do not rise to the level set by this Court in defining the tort. Jim Webber's conduct as Joan Zeltwanger's supervisor was certainly objectionable, reprehensible, at times even disgusting, but regrettably not that unusual (hence the enactment of a statutory remedy for sexual harassment in the workplace), and not "utterly intolerable in a civilized community".[3] The fact that the trial judge and at least three justices on the court of appeals disagreed with this view, which is supposed to be a matter of law,[4] and that their position is in no way flawed but is simply different from mine and at least two other Justices on this Court, makes me as uncomfortable as I was in *Twyman* that the core standard of liability for the tort is very subjective. But given the way the Court has defined the tort, the discomfort is unavoidable.

Today's rule is not based on the exclusive or preemptive nature of another remedy but on the nature of the IIED tort itself. I think Justice O'Neill is right that applying the rule will almost certainly prove highly problematic, but that prospect strikes me as one more reason to abandon the tort altogether. Until the Court reaches the same conclusion, the problems of the tort, including those created today, are a necessary evil.

Justice O'NEILL, concurring, joined by Justice SMITH.

In attempting to cabin what has clearly become an amorphous and overused tort, the Court has fashioned a cure that is worse than the disease. The "gap-filler" approach that the Court adopts to determine the viability of a claim for intentional infliction of emotional distress is unworkable and ill-advised. The sounder jurisprudential course would be to once again emphasize the stringent threshold an employee must meet to assert an intentional-infliction claim based on conduct occurring in the workplace. The conduct presented in this case, although certainly repugnant and reprehensible, did not rise to the extremely high level we have set for this tort. Accordingly, I concur in the Court's judgment, but not its reasoning.

I

Under the approach that the Court adopts today, the availability of a remedy for sexual harassment would foreclose an intentional-infliction claim to the extent that the two claims are based upon the same facts. Though beguilingly straightforward in theory, the "gap-filler" approach presents myriad problems in application that will, I believe, ultimately prove to be unworkable. For example, it is often difficult to discern whether the same facts will support different causes of action, forcing the fact-finder "to draw a virtually impossible distinction between recoverable and disallowed injuries." *Twyman v. Twyman,* 855 S.W.2d 619, 627 (Tex.1993) (Phillips, C.J., concurring and dissenting). In cases like this one, an employer would

---

**2.** 855 S.W.2d 619, 629–634 (Tex.1993) (Hecht, J., concurring and dissenting).

**3.** *Twyman,* 855 S.W.2d at 621 (Tex.1993) (quoting Restatement (Second) of Torts § 46 cmt 46, cmt. d (1965)).

**4.** *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 616 (Tex.1999).

essentially be required to present evidence to show that the acts complained of were in fact sexually motivated, thus *supporting* a sexual harassment claim, in order to obtain summary disposition of a claim for intentional infliction of emotional distress.

Moreover, while some of a supervisor's allegedly abusive actions in the workplace may have sexual motivations, others may not. Thus, conduct that would support an intentional-infliction claim might not support a sexual harassment claim, and vice-versa. In this case, Zeltwanger alleges certain actions that she claims are separate and apart from those constituting sexual harassment, such as "public humiliation, verbal oppression, physical threats, abuse of power, and mistreatment of an employee known to be peculiarly susceptible to emotional distress." We simply cannot know until a jury returns its verdict whether or not particular alleged behavior was sexually motivated, and even then it will prove difficult if not impossible for reviewing courts to parse the potentially overlapping evidence that might support the jury's findings.

Adopting a categorical "gap-filler" approach in all cases presents other problems, as well. For instance, plaintiffs may choose to forego pleading other available remedies in hopes of obtaining a potentially more lucrative intentional-infliction recovery. This would have the untenable effect of forcing defendants to assume the burden of proving alternative means of recovery *against themselves* to avoid intentional-infliction exposure. And if the plaintiff does decide to plead multiple liability theories based on the same facts, what happens if the jury fails to find liability on any other claim but intentional infliction of emotional distress? Does the fact that the plaintiff did not sustain his or her evidentiary burden on an alternative claim create a gap that intentional inflic-

tion was designed to fill? For these reasons, I would decline to adopt a categorical gap-filler approach in this case, without foreclosing the possibility that it might be appropriate in some other.

## II

Hoffman–La Roche alternatively challenges the legal sufficiency of the evidence to support Zeltwanger's claim for intentional infliction of emotional distress, whether we focus only on Roche's acts, as the court of appeals did, or on Webber's as well. Specifically, Roche claims there is no evidence of extreme and outrageous conduct as we have defined it for purposes of this tort. I agree that, as a matter of law, the record here will not support a claim for intentional infliction of emotional distress.

To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex.1998). To be extreme and outrageous for purposes of this tort, the conduct must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993) (quoting Restatement (Second) of Torts § 46 cmt 46 cmt. d (1965)). It is for the court to determine, in the first instance, whether particular conduct has met this high standard. *See GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 616 (Tex.1999); Restatement (Second) of Torts § 46 cmt 46 cmt. h (1965).

Roche contends that, in cases involving sexual misconduct in the workplace, courts have reached irreconcilable results in attempting to define extreme and outrageous conduct, providing no clear guidance to employers. Roche urges us to articulate specific criteria delineating when sexual harassment in the workplace becomes so egregious that it will support a claim for intentional infliction of emotional distress. Extreme and outrageous conduct in this context, Roche contends, should be defined as behavior of a continuing nature which is physically abusive or so threatening of immediate and substantial physical abuse that a reasonable person would feel afraid.

I agree with Roche that the legal standard for "extreme and outrageous conduct" sufficient to support an intentional-infliction claim has proved to be amorphous and often inconsistent. Since we first adopted the tort, it has been criticized as overly subjective and heavily value-laden. *See, e.g., Twyman,* 855 S.W.2d at 629 (Hecht, J., concurring and dissenting). In the employment context, particularly, we have set an exceptionally high bar to prevent employers from facing liability for "ordinary employment disputes." *GTE Southwest,* 998 S.W.2d at 612–13. We have recognized that employers, in properly managing their businesses, must be afforded wide latitude "to supervise, review, criticize, demote, transfer, and discipline employees," even though emotional distress will likely result. *Id.* at 612. In fact, we have held an employer's conduct to be sufficiently extreme and outrageous to support recovery for intentional infliction of emotional distress on only one occasion. *See id.* at 617. A close reading of that decision reveals that we applied a test very close to the one Roche advocates here.

In *GTE,* we recognized that an employee "may recover damages for intentional infliction of emotional distress in an employment context as long as the employee establishes the elements of the cause of action." *Id.* at 611. We cautioned, however, that an intentional-infliction claim "does not lie for ordinary employment disputes," *id.* at 612–13, but "only in the most unusual of circumstances." *Id.* at 613. In that case, three female employees sued GTE based upon their supervisor's abusive conduct. There was evidence that, like Webber, the supervisor continually told offensive jokes and engaged in sexual innuendo over the employees' repeated objections. *Id.* at 613. But there was additionally evidence that, in conjunction with that sexually harassing behavior, the supervisor repeatedly physically and verbally threatened and terrorized the employees. There was evidence, for example, that the supervisor

> was continuously in a rage, and that [he] would frequently assault each of the employees by physically charging at them.... [He] would bend his head down, put his arms straight down by his sides, ball his hands into fists, and walk quickly toward or "lunge" at the employees, stopping uncomfortably close to their faces while screaming and yelling. The employees were exceedingly frightened by this behavior, afraid that [he] might hit them. [A witness] testified that [the supervisor] charged the employees with the intent to frighten them. At least once, another employee came between [him] and [another employee] to protect her from [his] charge.

*Id.* at 613–14. There were numerous other occasions when the supervisor engaged in behavior that caused employees to feel immediately physically threatened. He would at least daily require one employee to come into his office and stand before him while he silently stared at her for as long as thirty minutes, on one occasion backing her into a corner and leaning over

her while he engaged in verbal abuse. *Id.* at 614.

In sustaining the employees' judgment for intentional infliction of emotional distress, we emphasized "the severity and regularity of [the supervisor's] abusive and threatening conduct." *Id.* at 617. We emphasized that employers must have substantial leeway in supervising and disciplining employees, and that "[o]ccasional malicious and abusive incidents should not be condoned, but must often be tolerated in our society." *Id.* But we concluded that the supervisor in *GTE* exceeded that leeway by "regularly assault[ing], intimidat[ing], and threaten[ing]" workers such that the workplace became "a den of terror for the employees." *Id.* Thus, we made it clear that the bar an employee must meet to assert a claim for intentional infliction of emotional distress in the workplace is exceptionally high.

The conduct Zeltwanger alleges in this case, while certainly vulgar and reprehensible, is not comparable to the pattern of behavior established in *GTE*. While there is evidence that Webber pounded on the dashboard of Zeltwanger's car on one occasion, touched her hair on another, rifled through her underwear drawer—purportedly in search of her stereo—on yet another, and was verbally abusive in conducting Zeltwanger's performance review, there is no evidence that he "regularly assaulted, intimidated, and threatened" her in the manner that *GTE* requires. *Id.* There is no suggestion of a deviation from normal practices in requiring Zeltwanger to undergo a performance review in Webber's home, given the company's structure, or in advising Webber that Turicchi would observe the review. While relying on a performance review compiled by a supervisor who could not be expected to be objective may reflect poor business judgment, it is not extreme and outrageous for purposes of supporting liability for intentional infliction of emotional distress. And while telling dirty jokes, discussing body parts, boasting of sexual prowess, flipping hair while referencing a "bad hair day," and delivering a cash prize through clenched teeth as though in a topless bar certainly constitute unacceptable workplace behavior supportive of a sexual-harassment claim, it does not, as a matter of law, amount to intentional infliction of emotional distress.

Undoubtedly, most conduct that would support a sexual-harassment claim is outrageous and intolerable, presumably the very reason the Legislature made such conduct statutorily actionable. But only when such behavior repeatedly becomes so forceful and intimidating that a reasonable person would feel immediately threatened or afraid can a court conclude with sufficient certainty that the actor intended to cause severe emotional distress or that severe emotional distress was the primary risk of the actor's conduct. *See Standard Fruit & Vegetable Co.*, 985 S.W.2d at 63. The record here reflects numerous instances of repugnant behavior and poor judgment. It does not, however, demonstrate a regular pattern of severely abusive behavior " 'so outrageous in character, and so extreme in degree,' " as to support a claim for intentional infliction of emotional distress. *Twyman*, 855 S.W.2d at 621 (quoting Restatement (Second) of Torts § 46 cmt 46 cmt. d (1965)).

### III

Accordingly, I concur in the Court's judgment, but not its reasoning.