**Thomas LOUIS, Appellant,**

v.

**MOBIL CHEMICAL COMPANY, a Division of Exxon Mobil Oil Corporation, James Bowser, and Randall Roy, Appellees.**

No. 09–06–568 CV.

Court of Appeals of Texas, Beaumont.

Submitted Sept. 27, 2007.

Decided May 1, 2008.

John Werner, Curtis W. Leister, Tom Kiehnhoff, Reaud, Morgan & Quinn, LLP, Beaumont, Wesley Hoyt, Bates & Hoyt, Lufkin, for appellant.

Robert J. Hambright, Orgain, Bell & Tucker, LLP, Beaumont, for appellees.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

## OPINION

CHARLES KREGER, Justice.

After his employment with Mobil Chemical Company ceased, Thomas Louis sued his former employer and two supervisors, James Bowser and Randall Roy, for intentional infliction of emotional distress, defamation, and retaliation. The trial court granted summary judgment for all defendants. The four issues raised by Thomas on appeal contend material fact issues exist as to each of the claims and that the trial court erred in granting summary judgment. We find no error and affirm the judgment.

Louis alleged that he falsified equipment safety reports at the direction of supervisors Bowser and Roy. Louis's petition alleged that in May 2004 Louis was accused of intentionally falsifying documents and was verbally abused, and that as a result he suffered a mental collapse. Louis alleged he was terminated on July 29, 2004, for violating the company's ethics policy. Louis also alleged that Bowser and Roy frequently used obscene and profane language when speaking to him. Louis alleged that Bowser, Roy, and Mobil (through Bowser and Roy as "vice-principals") acted intentionally and recklessly, that their conduct was extreme and outrageous, and that the conduct proximately caused Louis severe emotional distress. Louis alleged that defamatory and false statements of fact were published by the appellees "both verbally through its vice-principals and in writing" and that the statements were made with actual malice and/or with negligence. In the alternative, Louis "claim[ed] the protection of Texas Labor Code, Art. 451.001." [1]

The appellees filed a combined traditional and no-evidence motion for summary judgment. Tex.R. Civ. P. 166a(c), (i). Regarding Louis's claim of intentional infliction of emotional distress, the appellees argue that the supervisors' use of vulgar language and instructions to Louis regarding preventive maintenance records, and the company's investigation and termination of Louis, are not extreme and outrageous as a matter of law and they contend that Louis had no evidence the appellees' conduct was extreme and outrageous. Regarding Louis's defamation claim, the appellees moved for summary judgment on the grounds that any statement concerning Louis's falsification of records or violation of the company's ethics policy was true or substantially true. Appellees also sought summary judgment on the grounds that Louis had no evidence that any of the three defendants made a defamatory statement, that any such statement was false, and that any such statement was made negligently or with actual malice. Regarding Louis's retaliation claims, the appellees moved for

---

1. *See* Tex. Lab.Code Ann. § 451.001 (Vernon 2006).

summary judgment on the grounds that seven months after the visit to the plant nurse Louis was discharged for the legitimate non-discriminatory reason that he violated the company's ethics policy by falsifying preventive maintenance records. They also moved for summary judgment on the grounds that Louis had no evidence of a causal connection between a workers' compensation proceeding and his discharge.

■ In his summary judgment response, Louis concedes that the issue of whether the defendants' actions were sufficiently outrageous to constitute intentional infliction of emotional distress is a matter of law to be resolved by the trial court. In his response and on appeal, Louis argues all of the conduct must be evaluated as a whole to determine whether it was extreme and outrageous. "[W]hen repeated or ongoing severe harassment is shown, the conduct should be evaluated as a whole in determining whether it is extreme and outrageous." *GTE Sw., Inc. v. Bruce,* 998 S.W.2d 605, 616 (Tex.1999). *Bruce* concerned a pattern of conduct by a single supervisor. *Id.* at 608. Here, we have two individual defendants and one corporate defendant; we cannot simply hold Bowser's conduct to be extreme and outrageous based upon acts committed not by Bowser but by Roy. Therefore, we will examine each individual defendant's conduct in the context of the entire case to determine whether that defendant's conduct is so extreme and outrageous as to give rise to tort liability.

In his response to the trial court, Louis argued the following conduct was extreme and outrageous:

- Louis "filed fraudulent documents with the company in order to avoid threatened fictitious claims by his supervisors which would end his career."

- "Over a long period of time, the supervisors repeatedly insinuated that they were willing to misrepresent the truth" to obtain Louis's termination in a way that could not be challenged in court.

- "The threats were intertwined with derogatory language intended to humiliate" Louis.

- The threats of termination "were essentially blackmail" that compelled Louis "to falsify documentation or lose his job."

Louis was employed as an instrument technician at Mobil from 1998 until July 29, 2004. In his deposition, Louis related the following incidents in which he was subjected to vulgar language:

- An unidentified person cursed at Louis for working on the wrong meter.

- The same day, Roy used profanity and an ethnic slur during a conversation about calibrating a meter. Louis then spoke to Bowser and told Bowser he felt that they were not properly calibrating the meter. As a result, Bowser wrote out a work order to replace all the meters.

- Roy used a curse word when Louis asked Roy to assist him in replacing a meter. Louis went to Bowser, who called in a company representative to install it.

- On another occasion, a thermal oxidizer blew up. Roy used profanity when Louis told Roy they had to shut down the thermal oxidizer before he worked on the meter. Someone else did the job.

- After an incident for which Louis was written up, Bowser used profanity in relating the effect of his supervisors' displeasure with Bowser over the incident.

• Roy used a curse word when Louis provided incomplete paperwork because Roy wanted all of Louis's paperwork to reflect 100 percent completion. According to Louis, Roy knew Louis had not actually completed the work but he did not want Louis to fill out a deferral form because ... Roy wanted to be able to show that Louis had been doing the work by himself. Louis had replaced three people.

In addition to the events described in his deposition, Louis provided a summary judgment affidavit in which he states that his supervisors regularly used profanity. In his deposition, Louis admitted to using profanity himself on the job, but asserted that he did not use such language in a way that belittled others and he could not personally recall using profane language. In his affidavit, Louis averred that on more than fifty occasions Roy or Bowser used a racial slur when speaking to him. He also states that on at least twenty occasions Bowser and Roy "openly threatened to fabricate false accusations to 'blackball' me such that I would never be able to get a decent job in the future."

Louis admits he falsified preventive maintenance inspection reports in which he claimed work had been completed which he did not perform. In his deposition, Louis explained, as follows:

Q. On these calibration checks where you filled out the work that you—or filled out the paperwork saying that you did it, but you didn't do the work, is Randall Roy the only one that told you to do that?

A. I want to say yes.

Q. All right. And did he tell you specifically to fill out the paperwork without doing the work, or did he tell you, "I don't want any deferrals"?

. . . .

A. Okay. What Randall told me was to sign the compliance form and then at a later date, he would call me back and say—it could be sometimes a month later, sometimes two months later—and say, "I need the work for my compliance form."

And I'd say, "What work?"

And he would say, your PMs for X month.

And then I'd say, "Well, this is what I have."

Then he—he would say, "Don't bring me no [expletive] unless it's a 100 percent complete." I tried once, I tried probably several times to do a deferral; but he would not accept the deferral form from me because during that time he had situations going on with the per se "white boys" and he didn't want any of that [expletive] from me because he wanted my [expletive]—to say, "T.P. has been doing all of this by his self," ya, ya, ya, "we used to have this many people"—well, excuse the ya, ya, ya. "But T.P. has been doing his work by himself at a 100 percent completions," and it was easier for his Tier 1 reports on that.

Then at a later date, he would tell me to then produce the—the filled out PMs reflecting a 100 percent completions, even though the work was not performed.

Q. He told you to turn in PM completion forms without doing the work?

A. That's correct.

Q. In those exact words?

A. Give me a 100 percent completion, showing it to me with paperwork to support it.

Q. Well, he expected you to do your job, didn't he?

A. When I come to him with perhaps—just use a number—3 or 4 meters that were properly calibrated, he'd say

that—"You get your [expletive] out of my office with this [expletive]. I want all of it."

I said, "Well, I didn't have time to complete all the functions I want. I can do a deferral form."

"I'm not taking no deferral. Get your [expletive] out of my office. Come back to me when you have a 100 percent paperwork"; and mind you, this could be—like if the month is August, this could be like October when he'll tell me this.

. . . .

Q. All right. So, throughout that four-month period, thereabouts, you had responsibility for doing PM work on vapor detectors, correct?

A. That's correct.

Q. Okay. Did you do the PM work on the vapor detectors?

A. I did PM work on vapor detectors.

Q. Okay. Did you do it all according to ExxonMobil procedures?

A. When I did a PM on vapor detectors, I did it according to Mobil's procedure.

Q. All right. And did you fill out any paperwork incorrectly in regard to vapor detectors?

A. Under my instructions from Randall Roy to bring him a 100 percent completion of forms, I did work incorrect.

. . . .

Q. In what way was your paperwork not correct?

A. The fact that the work was not performed.

Q. So, you would go out into the field and perform some of the checks but not others?

A. With the multiple duties that I had on that unit, I was not able to complete all of my PMs.

Q. Okay. And yet you filled out the paperwork showing that you did complete the work on the vapor detectors?

A. Under fear of my job, under the fear of being blackballed from ever getting a job, under the fear of being fired, I did what I was instructed to do by bringing a 100 percent—showing a 100 percent completion of my work, even though my work was not complete.

In his summary judgment affidavit, Louis states that he was ordered by Bowser and Roy to falsify inspection reports.

■■■■ In the first instance, whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery for intentional infliction of emotional distress is a question of law. *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993). "[I]ntentional infliction of emotional distress is a 'gap-filler' tort never intended to supplant or duplicate existing statutory or common-law remedies." *Creditwatch, Inc. v. Jackson,* 157 S.W.3d 814, 816 (Tex.2005)(footnote omitted). Where the gravamen of the complaint is really another tort, intentional infliction of emotional distress is unavailable even if the evidence would be sufficient to support a claim for intentional infliction of emotional distress in the absence of another remedy. *See Hoffmann–La Roche Inc. v. Zeltwanger,* 144 S.W.3d 438, 441 (Tex.2004). "Even if other remedies do not explicitly preempt the tort, their availability leaves no gap to fill." *Creditwatch,* 157 S.W.3d at 816.

■■■■ Louis argues that the fact that the speakers were of the same race as Louis does not mitigate the effect of the racist term and that the repeated threats to end Louis's career, intertwined with humiliat-

ing language and compelling Louis to falsify documentation, created an intolerable and outrageous environment. However, racial discrimination in the workplace is actionable through employment discrimination statutes. For instance, *Creditwatch* concerned lewd advances by the company's chief executive officer and subsequent retaliation, which included refusing to provide a reference letter, announcing a company policy prohibiting contact with former employees, and having the plaintiff evicted. *Id.* at 816–17. Because all of her claims were covered by other remedies, the wronged employee could not sue for intentional infliction of emotional distress. *Id. Zeltwanger* also involved sexual harassment by a supervisor and another supervisor's failure to report the objectionable conduct. *Zeltwanger*, 144 S.W.3d at 448. Those elements of the employee's claim for intentional infliction that arguably fell outside the sexual harassment claim did not rise to the level of extreme and outrageous conduct. *Id.* at 449.

■ Louis contends the use of profane and inflammatory language caused him emotional distress. Such conduct falls within the statutory cause of action for racial discrimination or harassment. *See EEOC v. WC & M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir.2007)(citing elements of hostile work environment claim under Title VII). Those actions identified by Louis that arguably fall outside the scope of racial discrimination in employment do not rise to the level of extreme and outrageous. In *GTE*, the supervisor repeatedly physically and verbally threatened and terrorized female employees. *GTE Sw., Inc.*, 998 S.W.2d at 613–14. Viewed in the light most favorable to the non-movant in this case, Bowser and Roy threatened to trigger a negative termination of employment unless Louis produced paperwork showing work had been performed that Roy knew

Louis did not have time to perform. A threat to fire someone and ruin their career falls within the type of ordinary business dispute that is not actionable as a claim for intentional infliction of emotional distress. *See Tex. Farm Bureau Mut. Ins. Co. v. Sears*, 84 S.W.3d 604, 610–11 (Tex.2002) (mere threats do not rise to the level of extreme and outrageous conduct); *Rescar, Inc. v. Ward*, 60 S.W.3d 169, 180 (Tex.App.-Houston [1st Dist.] 2001, pet. granted, judgm't vacated)(threat to "blackball" worker). After all, an employer "generally can terminate an at-will employee for any reason or no reason at all." *See Mission Petroleum Carriers, Inc. v. Solomon*, 106 S.W.3d 705, 715 (Tex.2003).

■ Louis depends upon the objective to be achieved by the harassing conduct to provide the extreme degree required to pursue a claim for intentional infliction of emotional distress in the workplace. Louis alleged Bowser and Roy threatened to ruin his career unless Louis falsified preventive maintenance records for equipment "used by Defendant to monitor the flow and release of dangerous chemicals into the environment." Louis alleged that some or all of the reports "were required by Federal and State health and environmental laws." Retaliatory discharge for refusal to perform an illegal act the employee reasonably believed would subject him to criminal penalties is actionable as an exception to the employment-at-will doctrine. *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex.1985).

Louis's situation is distinguishable from *Sabine Pilot* in three respects: (1) Louis did not refuse to do the allegedly illegal act; (2) Roy and Bowser did not cause Louis's discharge—instead, Ken Jackson terminated Louis for violating the company's ethics policy; and (3) Mobil fired Louis for performing the allegedly illegal act, not for refusing to do it. Those dis-

tinctions indicate Louis could not prevail on a *Sabine Pilot* claim, but the likelihood of success on the claim does not affect the gravamen of his complaint. The nature of the complained-of conduct by Bowser and Roy is the threat to wrongfully discharge Louis unless he falsified his reports. That conduct would give rise to a *Sabine Pilot* claim but for Louis's participation in the allegedly illegal conduct. Where the gravamen of the complaint is really another tort, intentional infliction of emotional distress is unavailable. *Creditwatch,* 157 S.W.3d at 816; *Zeltwanger,* 144 S.W.3d at 441. We hold that the trial court did not err in granting a motion for summary judgment on Louis's claims for intentional infliction of emotional distress.

■ Next, Louis contends the trial court erred in granting summary judgment on Louis's defamation claim. At the outset, we note that the person who allegedly made the defamatory statement was Francis G. Carr, Sr. Carr works as an investigator on the audit staff for Exxon-Mobil Corporation. Carr conducted the investigation regarding whether Louis falsified preventive maintenance records. Obviously, neither Roy nor Bowser could be liable for a defamatory statement they did not publish. *See generally Minyard Food Stores, Inc. v. Goodman,* 80 S.W.3d 573, 577–78 (Tex.2002). Mobil, however, could be held liable for a defamatory statement published by its employee if the statement was false, made within the scope of the employee's general authority in furtherance of Mobil's business, and for the accomplishment of the object for which the employee was hired. *Id.*

Mobil moved for summary judgment on the ground that the statement was true and on the ground that Louis had no evidence that the statement was false. In his deposition, Louis testified that he told Carr and the others investigating the mat-

ter "that I'd fill out paperwork knowing that the performance had not been done." Louis's summary judgment affidavit states that in the presence of others Carr said that " 'you falsified company reports;" "it was your idea;" and "it was your decision to do so.' " According to Louis's affidavit, "Carr made this statement and it is false." Throughout this litigation, Louis has admitted that he did in fact falsify the reports; the defamatory nature of Carr's statement could arise only from the statement that it was "your idea" and "your decision to do so." Louis has never contended that he did not realize that he was falsifying the reports or that what he was doing was wrong and against company policy. Louis argues that the statement is defamatory because it "suggest[s] a more disreputable character, i.e. that Appellant hatched the plot for self-advancement motives as opposed to merely attempting to find a way to find some relief from the oppressive and degrading work environment that he found himself in."

■ Literally true statements are not slanderous merely because others might infer dishonesty. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex.1995). Nonetheless, "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 115 (Tex.2000). In deciding whether there is no evidence to support a defamation claim, the entire statement must be viewed in its context. *See City of Keller v. Wilson,* 168 S.W.3d 802, 811 (Tex. 2005).

Although he admits he falsified his reports, Louis argues the statement makes him appear to be more culpable than he

really is: in other words, he was the mastermind rather than a reluctant participant. Louis overstates Carr's comment regarding Louis's responsibility for the violation of company policy. The gist of the statement—that Louis knowingly falsified his reports—is by Louis's own admission the truth. The fact left out of the statement—that Roy pressured Louis to complete paperwork knowing that Louis did not have the time to perform the actual work—relates to Roy's culpability, not to Louis's, and does not diminish Louis's personal responsibility for failing to accurately record the work he performed.[2] Furthermore, the act that would tend to expose Louis to public scorn is the falsification of the documentation, an act Louis admits is true. The allegedly false fact in Carr's statement does not render an otherwise true statement defamatory. We hold the trial court did not err in entering summary judgment for all defendants on Louis's defamation claims and, accordingly, overrule issue two.

In his third issue, Louis contends the trial court erred in granting summary judgment on his workers' compensation retaliation claim. The Texas Labor Code prohibits an employer from discharging an employee for filing a workers' compensation claim in good faith. TEX. LAB.CODE ANN. § 451.001(1). "To prove a 'retaliatory discharge' claim, the employee must show that the employer's action would not have occurred when it did had the employee's protected conduct— filing a workers' compensation claim—not occurred." *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex.2005).

Circumstantial evidence and reasonable inferences from the evidence can establish the causal connection. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 451 (Tex.1996). If the employee can establish a causal link, the employer must rebut the alleged retaliation by showing that there was a legitimate reason for the discharge. *Id.* Although not elements of retaliation, circumstantial evidence offered to establish a causal link may include: "(1) knowledge of the compensation claim by those making the decision on termination; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false." *Aust v. Conroe Indep. Sch. Dist.*, 153 S.W.3d 222, 228 (Tex.App.-Beaumont 2004, no pet.).

In his deposition, Louis testified that Roy told him on December 29, 2003, to be back in Roy's office in ten or fifteen minutes with anything else he might have to support his paperwork. Louis realized his job was in jeopardy; his chest started to hurt and he went to Mobil medical. Louis went on medical leave until he was fired on July 29, 2004. At deposition, Louis was asked, "Did you ever ask to file a Workers' Comp claim about any of this?" He replied, "I asked James [sic] Sitton. She told me that you don't want to do that because that will be a recordable event for the plant and they don't want any recordables because of Workers' Compensation Act."[3] Louis identifies no other evidence

---

**2.** The statement was made during Carr's investigation of Louis's reports. Whether Roy's conduct was also being investigated is not a matter before this Court. Presumably, Carr would not be expressing opinions about misconduct by other employees, such as Roy, to Louis.

**3.** In his summary judgment affidavit, Louis identifies this person as a nurse named Jane Sitton. In his summary judgment affidavit, Louis states that he was placed on medical leave due to his emotional condition, and that a private physician diagnosed him with a ma-

to raise a fact issue against the appellees' motion for summary judgment. Louis does not suggest that either Bowser or Roy are personally liable for Louis's retaliation claim. He argues that the comment by the company nurse that Mobil would not want a recordable claim is "unmistakable evidence of animosity towards reporting workers compensation reports: it accepts the premise that there is an injury and focuses solely on whether it is a 'reportable,' i.e. on-the-job, claim."

Before we consider whether the evidence raises a fact issue on a retaliatory motive, however, we must determine whether any evidence supports a causal link between Louis's filing of a workers' compensation claim and the termination of his employment. There is summary judgment evidence that Louis was on medical leave from the day he learned the company was aware of the deficiencies in Louis's reports until the day his employment was terminated. There is evidence that he inquired about workers' compensation but there is no evidence that he filed a workers' compensation claim. Louis does not identify any summary judgment evidence that any of the people involved in the decision to terminate Louis's employment were aware of Louis's conversation with Sitton or that they suspected Louis might have filed a workers' compensation claim.

Louis's employment was terminated on July 29, 2004, for violating Mobil's ethics policy. The stated reason for the discharge related solely to Louis's falsification of the reports. The appellees attached Mobil's "Standards of Business Conduct" to their motion for summary judgment. The ethics standard states, "Employees must understand that the Corporation does care how results are obtained, not just that they are obtained. Employees must be encouraged to tell

higher management all that they are doing, [and] to record all transactions accurately in their books and records...." Louis concedes he falsified his reports and does not identify any evidence in the summary judgment record that the stated reason for the discharge was false.

The discrepancies in Louis's paperwork surfaced before Louis's chest began to hurt and there is no evidence in the summary judgment record to indicate that the investigation and subsequent decision to terminate Louis's employment was a pretext to disguise a retaliatory discharge. Thus, although Louis produced some evidence that a Mobil employee discouraged Louis from filing a claim for workers' compensation, there is no evidence that either directly or inferentially connects the nurse's comment to Louis's discharge from employment or that shows that Mobil did not have a legitimate non-discriminatory reason to terminate Louis's employment. The trial court did not err in granting motion for summary judgment for all defendants on Louis's retaliation claim. We overrule issue three.

Louis's final issue contends in a general assignment of error that the trial court erred in granting summary judgment. *See Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970). In addressing his other issues, we conclude the trial court properly granted summary judgment as to all of the claims and parties before the trial court. We overrule issue four and affirm the judgment.

AFFIRMED.

jor depressive disorder and prescribed medi-     cation.