

# NUMBER 13-23-00403-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE MATTER OF THE MARRIAGE OF KELLY HETTINGER AND ANDREW HETTINGER AND IN THE INTEREST OF H.C.H., K.C.H., AND M.G.H., CHILDREN

## ON APPEAL FROM COUNTY COURT AT LAW NO.8 OF HIDALGO COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Fonseca**
**Memorandum Opinion by Chief Justice Tijerina**

This is an appeal from a final divorce decree relating to issues of property division and a tort claim. By three issues, appellant/cross-appellee Andrew Hettinger argues: (1) appellee/cross-appellant Kelly Hettinger failed to show that Andrew engaged in extreme and outrageous conduct and that she suffered severe emotional distress as a result; (2) there is insufficient evidence to support the jury's $1,000,000 award to Kelly for physical pain and mental anguish and $500,000 for future physical pain and mental

anguish; and (3) the trial court erred in ordering him to pay child support in the amount of $6,000 because (a) there was no evidence that this amount was based on the proven needs of the children, and (b) Kelly included lifestyle costs and failed to segregate her expenses.

By three issues, Kelly argues that the trial court erred by: (1) divesting her of claims for personal injury, which were her separate property; (2) denying her motion to modify the final judgment to delete the trial court's erroneous award of her separate property to Andrew; and (3) granting Andrew's motion to strike the testimony of her expert witness John Camp. We reverse and render in part, reverse and remand in part, and affirm in part.

## I.    BACKGROUND

Kelly and Andrew married in 1997 and owned a company called Tex-Mex Recycling that recycled plastic. The parties had three children during the marriage: Kristy, Matt, and Holland.[1] In February 2019, Kelly filed for divorce on the grounds of adultery. She requested sole managing conservatorship of Kristy and Matt and child support.[2] Kelly amended her petition to include a claim for intentional infliction of emotional distress (IIED), among other causes of action. A jury trial commenced on August 15, 2022.

The jury found in favor of Kelly on her IIED claim and awarded her $1,000,000 for past physical pain and mental anguish and $500,000 for future physical pain and mental anguish. On September 28, 2022, Andrew filed a motion for judgment notwithstanding

---

[1] We identify the minor children by pseudonyms in this appeal to protect their identity. TEX. FAM. CODE ANN. § 109.002(d).

[2] At the time of the divorce, Holland had reached the age of majority.

2

the verdict on Kelly's IIED claim, arguing there was no evidence to support the IIED elements.[3] The trial court held a hearing on October 3, 2022, and denied the motion. Andrew filed a motion for new trial, which was denied by operation of law. This appeal followed.

## II. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

By his first issue, Andrew argues there is legally insufficient evidence to support Kelly's IIED claim.

### A. Trial Testimony[4]

At trial, Kelly testified that when Andrew's father passed away unexpectedly in October 2015, Andrew became "despondent," the "drinking got worse and worse," he "didn't wanna get up and go into work," and "wanted to drink it away." Kelly then hired Abby Murray, a certified public accountant (CPA) to help with Tex-Mex's financials. On December 25, 2015, Kelly went through Andrew's phone and "was horrified" by what she saw. According to Kelly, after four days of denial, Andrew admitted he was having affairs with at least four people. Kelly stated she was very upset, she stopped eating, and she left for California. When she came back, she would cry at the dinner table every night.

In 2016, Andrew and Kelly traveled to France with Abby and Jed Murray, Abby's husband. When the couples arrived at the hotel, Andrew and Jed left while Kelly stayed behind in the lobby awaiting the arrival of other guests. Andrew became irate and "cussed

---

[3] Andrew also moved for a directed verdict on Kelly's claims for breach of contract, breach of fiduciary duty, and civil conspiracy, which the trial court granted. Andrew also moved for a directed verdict on Kelly's IIED cause of action, which the trial court denied on two separate instances.

[4] The litigation proceedings in this case have been long and contentious. We recite only those facts necessary to reach our disposition on the issues raised. *See* TEX. R. APP. P. 47.1.

3

her out" when Kelly took their guests to a room because she did not follow his instructions to wait for him; he then forced Kelly to attend a parade and threatened to divorce her if she did not attend. Kelly stated she forced herself to go and was shaking the entire time out of fear.

In 2017, Kelly became very concerned with Abby's performance regarding Tex-Mex's finances. Large accounts were not being paid on time, things were improperly done, Abby was charging more for her services, and she started only working late at night. When Kelly voiced her concerns to Andrew, he assured her everything was fine. Kelly testified that Tex-Mex employees warned her that something was going on between Andrew and Abby, but Kelly was in denial. Kelly stated that she was "incredibly hurt" that Abby and Andrew would have an affair because Kelly trusted both, and Abby was a close friend.

Kelly testified that Abby asked Andrew and Kelly to take her and her children to Europe, but Kelly declined because Tex-Mex did not have the financial resources. Instead, Andrew and Abby took a six-week trip to Europe, which "hurt" Kelly. When Andrew and Abby returned, Kelly found Abby's lingerie in Andrew's luggage.

Nonetheless, in October 2018, Kelly and Andrew traveled to Germany to try to "save the marriage."[5] During the trip, Kelly was pickpocketed, and as she searched for a police officer to report her phone stolen, Andrew and she were separated. Kelly claims she was without identification, without money and transportation, and managed to walk over a mile with the assistance of others to get back to her hotel. When she arrived,

---

[5] Kelly testified that Andrew insisted Abby accompany the couple on the trip.

Andrew was inebriated laying on the sofa while on the phone with Abby and had urinated on himself. Kelly testified that she was "beyond shocked and beyond angry that [Andrew] was on the phone with Abby." Kelly gathered her belongings and flew back home.

In the fall of 2018, Kelly testified that she signed a bank note for $6.5 million. Four million was to purchase equipment that would increase Tex-Mex's profitability and sales, and the remaining amount was to purchase the building Tex-Mex was currently renting from its landlord. According to Kelly, she "believed in the projections that Abby put together . . . that it would drastically increase [Tex-Mex's] profitability[,] and it would be good for [her] family." Andrew told Kelly that Tex-Mex was having "significant cash flow problems," and signing this bank note "would help alleviate" the problems. Andrew further told Kelly that she needed to sign them because they were married and Tex-Mex was a joint asset, so Kelly was jointly liable.

In December 2018, Andrew and Abby stayed together in Reynosa overnight after attending Tex-Mex's holiday Christmas party there. Kelly filed for divorce in January 2019. Kelly testified that as soon as she filed for divorce, she was "locked out" of Tex-Mex and told she "was no longer able to come in" and was "then fired" and "taken off payroll."

Kelly denied Andrew's allegations that she physically abused her children. According to Kelly, she never slapped Holland—instead, she used a "three-finger tap" to discipline her teenager. Kelly insisted that she did not put hot sauce in the children's mouths to discipline them. On one instance, when Matt was five or six, she "wiped" a "drop" of Tabasco on his tongue because he used the "F-word."

**B. Standard of Review and Applicable Law**

"For legal sufficiency, we consider all the evidence in the light most favorable to the prevailing party, indulging every inference in that party's favor." *Gonzales v. Gonzales*, 704 S.W.3d 54, 64 (Tex. App.—Austin June 28, 2024, no pet.). We overrule the challenge if more than a scintilla of evidence supports the finding. *See id.* Evidence surpasses a mere scintilla, thus becoming legally sufficient to support the finding, when it allows reasonable and fair-minded people to differ in their conclusions on the contested issue. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822–23, 827 (Tex. 2005).

A tort claim for IIED may be brought by one spouse against the other in a divorce suit. *See Gonzales*, 704 S.W.3d at 64. IIED has four elements: "(1) the defendant acted intentionally or recklessly; (2) its conduct was extreme and outrageous; (3) its actions caused the plaintiff emotional distress; and (4) the emotional distress was severe." *Hersh v. Tatum*, 526 S.W.3d 462, 468 (Tex. 2017). By his first issue, Andrew challenges the second and fourth elements.

The Supreme Court of Texas has recognized that IIED is a "gap-filler" tort and that it "never intended that it be used to evade legislatively imposed limitations on statutory claims or to supplant existing common law remedies." *See Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). It was "judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Id.* "[W]here the gravamen of a plaintiff's complaint is really another tort, IIED is not available as a cause of action." *Moser v. Roberts*, 185 S.W.3d 912, 915 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.).

**C.**     **Discussion**

Kelly suggests her testimony regarding the following is evidence of extreme and outrageous conduct: Andrew firing her from Tex-Mex and financially cutting her off after the divorce; "attempting" to award 20% of Tex-Mex to Abby; causing a "large amount of attorney's fees to be spent to prove" Tex-Mex was community property; and duping Kelly into signing a bank note of $6.5 million. However, this testimony cannot support a claim of IIED "because other legal remedies exist for the purported wrongs." *See Bill Wyly Dev., Inc., v. Smith*, 680 S.W.3d 679, 689 (Tex. App.—Houston [14th Dist.] 2023, no pet.). Here, Kelly has judicial recourse for these claims because she can sue Andrew for breach of contract, and she can acquire her share of Tex-Mex through the trial court's property division of the community estate. *See Roberts*, 185 S.W.3d at 916 ("Because Roberts's claims for slander, libel, and malicious prosecution afforded her a remedy for any resulting emotional distress, there was no gap left to fill with an IIED cause of action."). Furthermore, regarding evidence that Andrew has accrued attorney's fees to dwindle the community funds, Kelly can assert causes of action for constructive fraud or waste on the community.

Again, IIED was created as a separate cause of action for egregious conduct that might otherwise go unremedied. *Zeltwanger*, 144 S.W.3d at 447. Because Kelly has other recognized theories of redress for these claims, we cannot agree with Kelly that this specific conduct is recoverable under an IIED theory. *See id.* Accordingly, because this conduct is recoverable under other causes of action, we conclude that evidence of this alleged conduct is not recoverable under an IIED theory. *See id.*

7

Next, Kelly argues that Andrew's conduct was outrageous in character and so extreme in degree it went beyond all possible bounds of decency. *See Gonzalez*, 704 S.W.3d at 70. Specifically, Kelly testified that Andrew's "regular use of vulgarities during the entire marriage," "demeaning communications" to her, and "hurtful and negative statements to others about her" is evidence of outrageous conduct.[6] Kelly testified that Andrew's extravagant and frequent travel around the world with Abby,[7] his extramarital affairs, and his abandoning her in Germany to speak with Abby on the phone while she was without a phone or money are evidence of extreme and outrageous conduct. Andrew states that if this Court agreed with Kelly that an affair is grounds for extreme and outrageous conduct, then "almost every divorce filed on grounds of adultery could potentially include an IIED claim."

### 1.    Applicable Law

Extreme and outrageous conduct is shown if "the conduct is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006)). "Conduct that is merely insensitive or rude is not extreme and outrageous, nor are 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Kroger Tex.*, 216 S.W.3d at 796 (quoting *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex. 1999)). Acts

---

[6] Specifically, Kelly complains of the following vulgarities: calling her a bitch, whore, cunt, slut, worthless; telling her she is an evil and awful person and mother and needs to be committed or institutionalized; yelling at her; telling her to go f[]ck herself; and accusing her of giving him an STD, using drugs, being crazy, having affairs, being bipolar, and addicted to cocaine.

[7] According to Kelly, Andrew traveled "first class airline travel" and enjoyed "expensive meals and champagne" with Abby.

that are merely "callous, meddlesome, mean-spirited, officious, overbearing, and vindictive," and occasional malicious and abusive incidents are not extreme and outrageous conduct. *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 817–18 (Tex. 2005); *GTE Sw.*, 998 S.W.3d at 617. However, "[b]eing purposely humiliated and intimidated and repeatedly put in fear of one's physical well-being is more than a mere triviality or annoyance." *Gonzalez*, 704 S.W.3d at 68. When this conduct "becomes a regular pattern of behavior and continues despite the victim's objection and attempts to remedy the situation," it is then both severe and regular and enters the realm of extreme and outrageous. *Id.*

"Recovery for intentional infliction of emotional distress must typically be based on circumstances that border on 'serious criminal acts.'" *Smith*, 680 S.W.3d at 689 (citing *Creditwatch*, 157 S.W.3d at 818). "Meritorious claims for intentional infliction of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous." *Id.* (citing *Kroger*, 216 S.W.3d at 796; *Richard Rosen, Inc. v. Mendivil*, 225 S.W.3d 181, 184-85 (Tex. App.—El Paso 2005, no pet.) (reversing a jury verdict where the appellant treated the plaintiff "rudely, insensitively, verbally threatened him, and, as alleged by [the plaintiff], defamed his reputation")); *Union Pac. R.R. v. Loa*, 153 S.W.3d 162, 164 (Tex. App.—El Paso 2004, no pet.) (reversing a jury verdict where vulgar, obscene, and racist insults were not sufficiently extreme and outrageous to support a IIED recovery); *Saucedo v. Rheem Mfg. Co.*, 974 S.W.2d 117, 123–24 (Tex. App.—San Antonio 1998, pet. denied) (finding the conduct did not rise to the level of extreme and outrageous conduct where over a three-year period, the defendant employer repeatedly humiliated the plaintiff with

9

obscene language, insulted him, threatened to have him fired, and frequently called him late at night). None of Andrew's conduct, as alleged by Kelly, borders on "serious criminal acts," and, as a result, we cannot conclude that any of this conduct is severe enough to rise to the level of extreme or outrageous conduct. *See Smith*, 680 S.W.3d at 689 (finding that though appellant's conduct was "callous, meddlesome, mean-spirited, officious, overbearing, and vindictive, his actions were not so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community") (internal quotations omitted); *Zeltwanger*, 144 S.W.3d at 449.

In *Castro*, we found that appellant's conduct was "extreme and outrageous, atrocious conduct that should not be tolerated in a civilized society." *Castro v. Castro*, No. 13-13-00186-CV, 2014 WL 3802613, at *9 (Tex. App.—Corpus Christi–Edinburg July 31, 2014, pet. dism'd) (mem. op.). In that case, the wife had a daughter from a previous relationship. *Id.* at *3. The daughter testified that she witnessed the appellant abuse the wife, and the wife stated that she "deserved that kind of thing" and "made [the appellant] do that." *Id.* at *4. The daughter stated that the appellant frequently yelled and physically disciplined her, and she repeatedly told the wife to call the police. *Id.* There was evidence that: throughout the wife's pregnancy, the appellant continuously threatened the wife that she was going to die and that her baby was going to die; the appellant refused to let her wear make-up; the appellant prevented her from seeing family members; the appellant punched a hole in the wall; the appellant pointed a gun in her face; the appellant refused to purchase things for their baby because he assured her the baby would die before birth; the appellant canceled the wife's credit card when the wife purchased things for the baby;

10

the wife could not visit her terminally ill mother because of the bruises on the wife's body from the appellant's physical abuse; the appellant disowned their child, abandoned them, refused to provide for them, and would not return unless the wife started taking Lithium; the appellant would spit on the wife and raped her; the appellant physically abused her on numerous occasions; the appellant threatened to kill her several times and discussed ways he planned to kill her. *See id.* *1–4. Based on this evidence, including the appellant's admissions of being physically abusive with the wife, we held that the appellant's conduct "showed an intentional pattern of conduct that was so outrageous in character that it exceeded all possible bounds of decency—even in the context of a marriage." *Id.* at *9.

In *Gonzalez*, the Austin Court of Appeals found the evidence legally sufficient for extreme and outrageous conduct. 704 S.W.3d at 70–71. In that case, the appellant admittedly threated to kill his wife and "fight her to the death"; coworkers witnessed the wife's injuries on her body; caused their child to be dismissed from daycare; locked pantry doors to prevent the wife's children from eating; pinned the wife against the wall with a car seat; broke the wife's laptop; berated their child; appeared outside the home about ten to fifteen times to stalk her; set up cameras unbeknownst to the wife inside and outside the home to surveil her; isolated the wife from her child; and caused the wife to have panic attacks at therapy (among others). *Id.* at 68–70. Furthermore, there was evidence that police responded to incidents of abuse. *Id.* at 69. The court held that the appellant's entire course of conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and be regarded as utterly intolerable in a civilized society. *Id.* at 70.

In *Toles*, the Dallas Court of Appeals found the evidence legally sufficient to support an IIED claim. *See Toles v. Toles*, 45 S.W.3d 252, 260 (Tex. App.—Dallas 2001, pet. denied). In that case, there was evidence that the appellant mentally and physically abused the wife. *See id.* The wife testified that the appellant pinned her against the wall, choked her, spit on her, poured various liquid substances on her (including Coke, water, orange juice, and Nyquil), threw barbeque on her, locked her out of her house, crushed her hand, pulled her out of the car, stomped on her feet, threatened to smother her, threatened to snap her neck, broke planters and a vase, destroyed numerous items of her personal property that had sentimental value, destroyed her college papers that she stayed up all night typing, dumped her clothes out of the closet, cut her clothing with scissors, called her names, and yelled obscenities at her. *Id.* Hospital records indicated a bruise on the wife's leg, which the wife testified was caused by the appellant dragging her out of the car, across the center console, and out of the driver's side. *Id.* The appellant did not dispute many of the incidents that occurred. *Id.* The appellate court found that numerous incidents of assault and intimidation supported the jury's finding of extreme and outrageous conduct. *Id.* at 271.

### 2. Discussion

Based on the foregoing and relying on *Castro*, *Gonzalez*, and *Toles*, we cannot conclude that Andrew's conduct was more than mere insults, indignities, or threats or discord normally resulting from an unhealthy marriage, such that it rose to the level of extreme and outrageous conduct. *See Gonzalez*, 704 S.W.3d at 68 ("[T]here must be evidence of some conduct that takes the dispute outside the scope of an ordinary marital dispute and into the realm of extreme and outrageous conduct.") (internal citations

12

omitted)). Thus, we find the evidence was legally insufficient to support the jury's finding that Andrew's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *See id.* at 71. We sustain Andrew's first issue.

In light of our conclusion, we need not address the argument in Andrew's first issue that Kelly did not suffer severe emotional distress, nor need we address his second issue arguing that there is insufficient evidence of physical pain and mental anguish. *See* TEX. R. APP. P. 47.1.

### III.    CHILD SUPPORT

By his third issue, Andrew argues that the trial court abused its discretion when it ordered him to pay $6,000 per month in child support because Kelly failed to prove the cost of the children's needs. Andrew challenges the trial court's findings of fact, arguing that it abused its discretion by considering Kelly's household expenses, needs and lifestyle, and use and enjoyment of her property.

### A.    Standard of Review

We review a trial court's grant of child support for an abuse of discretion. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). A trial court abuses its discretion if it acts arbitrarily or unreasonably or does not analyze or apply the law properly. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011). Whether the evidence supporting the decision is legally and factually sufficient is relevant in deciding whether the trial court abused its discretion. *See In re A.B.H.*, 266 S.W.3d 596, 601 (Tex. App.—Fort Worth 2008, no pet.) (op. on reh'g) (applying standard); *see also Vanderbol v. Vanderbol*, No. 02-23-00230-CV, 2024 WL 1925141, at *2 (Tex. App.—Fort Worth May 2, 2024, pet. denied) (mem. op.) ("Although

sufficiency of the evidence is not an independent ground of error under the abuse-of-discretion standard, it is a factor in assessing whether the trial court abused its discretion.").

**B.    Applicable Law**

The Texas Family Code provides for a bifurcated analysis in setting child support, depending on whether an obligor has net monthly resources above or below $9,200. *See* TEX. FAM. CODE ANN. § 154.125(a); *see also* Office of the Att'y Gen., Announcement of Adjustment Required by Texas Family code § 154.125, 44 Tex. Reg. 3559, 3559 (2019) ("Effective September 1, 2019, the guidelines for the support of a child apply to situations in which the obligor's monthly net resources are not greater than $9,200.00."). If the obligor's monthly net resources exceed $9,200—as here—the court "shall presumptively apply" the guidelines based on the monthly net resources of the obligor but "may order additional amounts of child support as appropriate, *depending on the income of the parties and the proven needs of the child*." *Id.* § 154.126(a) (emphasis added); *Zorilla v. Wahid*, 83 S.W.3d 247, 253 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.); *see also Troiani v. Troiani*, No. 13-18-00271-CV, 2019 WL 5444407, at *4 (Tex. App.—Corpus Christi–Edinburg Oct. 24, 2019, no pet.) (mem. op.) (same). Thus, § 154.126(a) of the family code grants the court discretion to order additional amounts over and above the statutory guideline amount only *after* the trial court determines the proven needs of the child. *See* TEX. FAM. CODE ANN. § 154.126(b) ("[I]n no event may the obligor be required to pay more child support than the greater of the presumptive amount or the amount equal to 100 percent of the proven needs to the child."); *see also In re K.F.*, No. 02-18-00187-CV, 2018 WL 6816119, at *4 (Tex. App.—Fort Worth Dec. 27, 2018, pet. denied) (mem.

14

op.) ("[P]rior to awarding more than the guideline amount, the trial court must first determine the proven needs of the child.").

"To impose child support beyond the [statutory] guidelines, the record must contain evidence of the 'proven needs' of the child." *In re M.A.M.*, 346 S.W.3d 10, 17 (Tex. App.—Dallas 2011, pet. denied); *see also In re J.A.V.*, No. 04-21-00084-CV, 2022 WL 379316, at *5 (Tex. App.—San Antonio Feb. 9, 2022, no pet.) (mem. op.) (same). While the needs of the child are not limited to the bare necessities of life, the trial court does not consider the parents' ability to pay or the lifestyle of the family. *See Rodriguez v. Rodriguez*, 860 S.W.2d 414, 417 n.3 (Tex. 1993); *see also Scott v. Younts*, 926 S.W.2d 415, 420 (Tex. App.—Corpus Christi–Edinburg 1996, writ denied) (holding that the trial court improperly considered factors outside of those set forth in the predecessor to § 154.126 for an obligor earning over the presumptive obligation).

## C. Analysis

The parties agree that Andrew's net resources are over $9,200 and that the presumptive monthly child support obligation under the family code is $2,300. *See* TEX. FAM. CODE ANN. § 154.126(a) ("If the obligor's net resources exceed the amount provided by [§] 154.125(a), the court shall presumptively apply the percentage guidelines to the portion of the obligor's net resources that does not exceed that amount."). As a result, the trial court had discretion to award additional child support under § 154.126 provided there was evidence establishing "the income of the parties and the proven needs of the child." *Id.* § 154.126(a).

However, the trial court erroneously applied the factors listed in § 154.123 rather than those listed in § 154.126, and Kelly's trial testimony was based on the § 154.123

15

factors.[8] *See* Tex. Fam. Code Ann. § 154.123 (allowing a trial court to consider certain factors when ordering periodic child support payments in an amount other than that established by the guidelines). The family code expressly prohibits the trial court from considering the § 154.123 factors when it orders child support beyond the statutory range as the trial court did here. Tex. Fam. Code Ann. § 154.126 (providing that the court may award additional child support "[w]ithout further reference" to the percentage guidelines in § 154.125); *Rodriguez*, 860 S.W.2d 414, 417 (Tex. 1993) (providing that § 154.123 provides "bases for variance from strict application of the percentage guidelines," but only applies to net resources fewer than $9,200); *In re Marriage of Contreras*, No. 13-21-00063-CV, 2022 WL 17983483, at *6 (Tex. App.—Corpus Christi–Edinburg Dec. 29, 2022, no pet.) (mem. op.) (providing that § 154.126 only applies where the obligor's monthly net resources exceed $9,200).

Child support awarded above the presumptive guideline amount must "be based solely on the needs of the child at the time of the order." *Rodriguez*, 860 S.W.2d at 417; *In re Pecht*, 874 S.W.2d 797, 801 (Tex. App.—Texarkana 1994, no writ) (finding that when the trial court awarded child support past the statutory amount, it encompassed a number of factors that were not limited to the needs of the children and any additional amount "must be based solely on the needs of the children"); *In re Marriage of Thurmond*, 888

---

[8] *See Lide v. Lide*, 116 S.W.3d 147, 156 (Tex. App.—El Paso 2003, no pet.) (finding that the children's needs must be supported by evidence and must be explained or itemized); *see also In re K.F.*, No. 02-18-00187-CV, 2018 WL 6816119, at *5 (Tex. App.—Fort Worth Dec. 27, 2018, pet. denied) (mem. op.) (holding that a spreadsheet of current expenses coupled with "Mother's corresponding conclusory testimony about proven needs on direct examination" was insufficient to establish the "proven needs of the child" warranting an increase amount of child support beyond the statutory guidelines); *Panozzo v. Panozzo*, No. 13-96-241-CV, 1997 WL 33760707, at *1 (Tex. App.—Corpus Christi–Edinburg Dec. 11, 1997, no pet.) (mem. op.) ("Here, there is only evidence that the typical monthly household expenses for [appellee] and the children ranged from $4,000 to $5,000 per month in 1992, prior to the suit for divorce. This is not sufficient evidence of the 'proven needs' of the children.").

S.W.2d 269, 278 (Tex. App.—Amarillo 1994, writ denied) (reinforcing *Rodriguez*'s conclusion that "lifestyle" could not be considered when awarding child support beyond the presumptive level in cases where the obligor' income rose above the statutorily designated income level). "Although the court may consider a wide range of factors in setting support obligations for persons who earn less than [$9,200] in net monthly resources, the Code provides a much narrower method for calculating the support obligation when an obligor's net monthly resources exceed $[9,200], as they do in this case." *Scott*, 926 S.W.2d at 419; *see In re Gonzalez*, 993 S.W.2d 147, 159 n.3 (Tex. App.—San Antonio 1999, no pet.) (holding that § 154.126 narrows the factors to consider in high-income child support cases); *see also In re J.A.V.*, 2022 WL 379316, at *7 ("The trial court did not base its 'proven needs' finding on vacations, birthdays, and extracurricular activities."); *Brown v. Brown*, No. 11-12-00248-CV, 2014 WL 4251159, at *5 (Tex. App.—Eastland Aug. 21, 2014, no pet.) (mem. op.) ("The trial court was not permitted to consider these 'lifestyle' preferences when deciding if Ronald should be required to pay additional child support."); *In re T.A.W.*, No. 02-09-00309-CV, 2010 WL 4813356, at *6 (Tex. App.—Fort Worth Nov. 24, 2010, no pet.) (mem. op.) ("[T]hus, even if the trial court correctly exercised its discretion by rejecting Father's definition of 'need' as being overly narrow, the record reflects that the trial court erred by considering a factor—lifestyle—beyond those outlined in family code [§] 154.126(a).").

At trial, Kelly testified as to her lifestyle preferences, how it has decreased significantly since the divorce, how her preference is to have the same amount of money that Andrew is able to spend with the kids, how unfair it is that she is unable to travel the same as Andrew, and how terrified she is for her own financial stability. *See Rodriguez,*

860 S.W.2d at 417 (holding that lifestyle cannot be considered when awarding child support beyond the presumptive level). Kelly further testified regarding shared expenses between her and the children and numerous miscellaneous expenses—unrelated to the proven needs of the children.[9]

Having reviewed the entire record, we conclude the evidence was legally insufficient to prove any needs of the children beyond the presumptive guidelines amount as applied to Andrew's net resources. Accordingly, the trial court abused its discretion by awarding support above that amount. *See* TEX. FAM. CODE ANN. § 154.126; *Iliff*, 339 S.W.3d at 78; *see also Brown*, 2014 WL 4251159, at *5 ("The trial court was not permitted to consider these 'lifestyle' preferences when deciding if Ronald should be required to pay additional child support."); *see also In re Pecht*, 874 S.W.2d at 801 n.8. ("The findings of fact and conclusions of law filed in the present case do not include a finding concerning the exact amount of the children's monthly needs."); *Golias v. Golias*, 861 S.W.2d 401, 404 (Tex. App.—Beaumont 1993, no writ). We sustain Andrew's third issue.

## IV.   SEPARATE PROPERTY

By her first issue, Kelly argues the trial court erred by categorizing a pending lawsuit filed in the 92nd District Court (92nd Suit) as community property and awarding

---

[9] Specifically, Kelly testified regarding expenses related to replacing a garage door spring, two refrigerators, ice machines, water heater and its repiping, redoing gutters, getting her trees cut, the children's Starbucks spending habits, her landscaper expenses, her housecleaners' expenses, pool maintenance, her airline tickets, and her healthcare copays. *See Scott v. Younts*, 926 S.W.2d 415, 419 (Tex. App.—Corpus Christi–Edinburg 1996, writ denied) ("Any support ordered in excess of [the presumptive guidelines amount] may only be based on the unmet needs of the child."); *see also Warren v. Warren*, No. 13-05-00429-CV, 2008 WL 668213, at *3 (Tex. App.—Corpus Christi–Edinburg Mar. 13, 2008, no pet.) (mem. op.) (finding that Mother created a "meticulous" budget over a six-month period and separately listed her expenses from those of her two children); *In re S.C.*, No. 05-22-00333-CV, 2024 WL 396613, at *2 (Tex. App.—Dallas Feb. 2, 2024, no pet.) (mem. op.) ("If it was a shared expense by Mother and the children, Mother segregated her one-third from the total, leaving the remaining two-thirds to represent the children's portion.").

18

100% of it to Andrew. According to Kelly, the 92nd Suit was her separate property. Kelly further argues that the trial court erred by denying her motion to correct, reform, or modify the judgment. Andrew counters that Kelly waived this issue because she failed to submit it to the jury. Alternatively, Andrew argues that Kelly "provided no evidence proving the separate property nature of the claims at issue."

## A.  Applicable Law and Standard of Review

"Community property consists of the property, other than separate property, acquired by either spouse during the marriage." TEX. FAM. CODE ANN. § 3.002. As relevant here, a "spouse's separate property" includes "the recovery for personal injuries sustained by the spouse during marriage, except any recovery for loss of earning capacity during the marriage." *Id.* § 3.001(3).

Generally, "[p]roperty possessed by either spouse during or on dissolution of marriage is presumed to be community property." *Id.* at § 3.003. However, "[t]here is no presumption that a potential recovery for a personal injury to the body of a spouse is community property. A recovery for personal injuries to the body of a spouse is separate property of that spouse." *Osborn v. Osborn*, 961 S.W.2d 408, 414 (Tex. App.—Houston [1st Dist.] 1997, pet. denied); *see also* TEX. FAM. CODE ANN. § 3.001(3). The damages that are the separate property of the injured spouse include those for disfigurement and for physical pain and suffering in the past and in the future. *Osborn*, 961 S.W.2d at 414; *see Licata v. Licata*, 11 S.W.3d 269, 274 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ("These recitals become prima facie evidence the recovery is separate property," and "[w]hen this triggering event occurs, the spouse claiming that the property is community must then come forward with evidence to sufficiently rebut this separate property

19

presumption and a failure to do so conclusively establishes that such property is separate property."). Conversely, the damages that belong to the community estate include loss of earning capacity during the marriage, medical expenses incurred during the marriage, and for other expenses associated with injury to the community estate. *See Licata*, 11 S.W.3d at 273; *Osborn*, 961 S.W.2d at 414.

The trial court shall order a division of the parties' estate in a manner the court deems "just and right." TEX. FAM. CODE ANN. § 7.001. We review a trial court's division of the estate for an abuse of discretion. *Roberts v. Roberts*, 531 S.W.3d 224, 231 (Tex. App.—San Antonio 2017, pet. denied). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without any reference to guiding rules and principles. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

"When a trial court mischaracterizes separate property as community property, the error requires reversal because the subsequent division divests a spouse of his or her separate property." *Sheshtawy v. Sheshtawy*, 150 S.W.3d 772, 780 (Tex. App.—San Antonio 2004, pet. denied); *see Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977) ("A constitutional problem also arises from the trial court's decree that the husband's separate property shall become the separate property of the divorced wife."). "Once reversible error affecting the 'just and right' division of the community estate is found, the court of appeals must remand the entire community estate for a new division." *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985).

## B.    Pertinent Facts

On August 4, 2020, while the divorce was pending, Kelly filed the 92nd suit against Abby, asserting claims for gross negligence, breach of fiduciary duty, IIED, violations of

20

Deceptive Trade Practices Act, interference with business relations and civil conspiracy. According to Kelly, Abby had a conflict of interest while engaging in an extramarital affair with Andrew, conspired to obtain property of the parties, wasted community money, and plotted with Andrew to violate her fiduciary duty to Kelly to maximize Andrew's financial advantages.

On June 13, 2023, at a hearing to finalize the divorce decree, Kelly's counsel reminded the trial court that it had previously ruled the 92nd Suit was Kelly's separate property:

> We have had two hearings on it. Your Honor ruled that claims that [Kelly] owns as her separate property, which is breach of duty and [IIED], that [Kelly] retains those claims because they're her separate property . . . . We are talking about individual claims of [Kelly] against [Abby], and you ordered that the individual claims of [Kelly] would remain with her . . . . And [Andrew's counsel] goes back again on the tort claims and puts [in his proposed decree that] all claims against [Abby] are awarded to [Andrew]. That's intentional, Judge. Twice you have already ruled that the separate property claims would remain [Kelly's].

Counsel explained to the trial court that her personal claims against Abby were her personal property because they included claims for IIED and breach of fiduciary duty. In response, Andrew's counsel suggested that the trial court award Kelly her personal claims against Abby in exchange for $600,000. The following transpired:

| Trial Court: | [T]he intent of the Court was to award that entire lawsuit to [Andrew] and I based the value that you put on it. |
| Kelly's Counsel: | But what is the reason that the Court is divesting her of a chosen action of a right to sue this woman who has stolen from her? |
| Trial Court: | $600,000 value that you-all claimed it was worth. |

21

| Kelly's Counsel: | You don't pay the value for a lawsuit before you have a value. |
|---|---|
| Trial Court: | Well, that's what you-all claimed it was worth . . . . The other thing I can do is redo the math and say okay it's worth zero. Let her keep whatever she wants out of it and she can risk collecting the 600[,000] that I've already granted it. |
| Kelly's Counsel: | Your Honor, you ruled on this twice. Why in the world . . . would you now take that away from her? That's from . . . back in November. |
| Trial Court: | Because that—that was the intent when I did this. I mean, I gave her $600,000 of value on, like you said, something that we don't even know what it is. If the jury could come back and zero her out and then what? Here she made 600,000 for sure. |

The trial court awarded the 92nd Suit to Andrew, remarking: "You know what? You-all are going to appeal it anyway. Appeal that decision too."

On July 11, 2023, Kelly filed a motion to correct, reform, or modify the judgment. In the motion, Kelly attached a transcript of a previous hearing dated January 31, 2023, wherein the following occurred:

| Trial Court: | Okay. So if they're not community, she may have an interest. If they are, they're his. |
|---|---|
| Andrew's Counsel: | Well, Judge, as you ordered in your division that he was awarded all of the community's interest in that lawsuit. So that would only— |
| Trial Court: | Right. But just like . . . you would agree that sometimes in litigation, you have causes of action that belong to a community, and sometimes they belong to an individual, right? |
| Andrew's Counsel: | Yes, Judge. |
| Trial Court: | Okay. So I'm not—and I'm not saying right here and now that whatever causes of action are her |

22

individual causes of action are community. I mean, I don't have the pleading in front of me and I haven't looked at it. But if it—if they are as such that normally would not be considered community assets, then—and personal assets only, well then they're her personal assets.

Andrew's Counsel: Your Honor, she already brought all of her claims for fraud, intentional infliction, breach of fiduciary duty. All of those tort claims, she already brought them in this suit, and you and the jury already made a determination of all those matters. She doesn't get to file for those claims—

Trial Court: But were they against [Abby[10]]?

On August 17, 2023, the trial court held a hearing on Kelly's motion. At the hearing, Kelly's counsel insisted that the trial court could not divest her of her breach of fiduciary duty and IIED causes of action as those claims were Kelly's separate property. The trial court denied the motion. This appeal followed.

## C.  Discussion

First, we address Andrew's assertion that Kelly waived this issue because she failed to submit the characterization of her 92nd Suit to the jury. He relies on *Michelena* to support his position. *See Michelena v. Michelena*, No. 13-09-00588-CV, 2012 WL 3012642, at *7 (Tex. App.—Corpus Christi–Edinburg June 15, 2012, no pet.) (mem. op.) (concluding that because appellant did not request that certain property be submitted to the jury for characterization as community or separate or for valuation, he waived his right to complain of the trial court's characterization). We find *Michelena* inapposite to the facts here because that case concerned a "substantial amount of property possessed by the

---

[10] The record does not contain the complete transcript of the January 31, 2023 hearing.

23

couple that had not been disclosed" prior to trial. *Id.* The property in that case did *not* consist of a lawsuit, and that case did not apply § 3.001 for "the recovery for personal injuries sustained by the spouse during marriage." *See* TEX. FAM. CODE ANN. § 3.001(3). Therefore, we decline to find waiver based on *Michelena*. *See id.*; *see also Michelena*, 2012 WL 3012642, at *7.

Andrew alternatively argues that Kelly failed to prove that the 92nd Suit was her separate property because she provided "no evidence proving the separate nature" of the claims and therefore "failed to overcome the presumption that a parties' assets owned at divorce are community property." Again, "[t]here is no presumption that a potential recovery for personal injuries to the body of a spouse is community property." *Osborn*, 961 S.W.2d at 414. Because § 3.001 expressly states that a spouse's recovery for personal injuries to the spouse's body is separate property, Kelly was not required to overcome a community property presumption as Andrew suggests. *See* TEX. FAM. CODE ANN. § 3.001(3); *Chu v. Hong*, 249 S.W.3d 441, 444 (Tex. 2008) (providing that "personal injury claims are the separate property of each spouse"); *see also In re Marriage of Franklin*, No. 07-04-0515-CV, 2006 WL 1680875, at *3 (Tex. App.—Amarillo June 19, 2006, pet. denied) (mem. op.) ("[N]o presumption of community property applies to a potential recovery for personal injuries.").

At the January 31, 2023 hearing, Kelly explained to the trial court that her pending claims against Abby included individual claims of IIED and breach of fiduciary duty; these damages are personal to Kelly. *See Twyman v. Twyman*, 855 S.W.2d 619, 625 n. 20 (Tex.1993) ("[R]ecovery for personal injuries of a spouse, including pain and suffering, is the separate property of the injured spouse, and therefore does not add to the marital

24

estate."); *Schlueter v. Schlueter*, 975 S.W.2d 584, 587 (Tex. 1998) ("[T]he action in *Price* was one for personal injury, for which any recovery would be separate property of the injured spouse."). Andrew has not directed this court to any evidence he produced that the damages sought in Kelly's breach of fiduciary duty and IIED claims against Abby are not Kelly's separate property, and we have found none. *See Licata*, 11 S.W.3d at 274. Similarly, Andrew has not directed us to evidence that Kelly is seeking recovery for "loss of earning capacity during the marriage." *See* TEX. FAM. CODE ANN. § 3.003(3).

Given that the trial court mischaracterized the 92nd Suit as community property and then awarded it entirely to Andrew, we cannot determine if the mischaracterization affected the trial court's just and right division of property. *See id.*; *see also Osborn*, 961 S.W.2d at 415 (concluding that husband's suit for personal injuries was his separate property and reversing trial court's community property finding). Accordingly, we "remand the entire community estate for a just and right division based on properly characterized property." *Osborn*, 961 S.W.3d at 415; *see also Jacobs*, 687 S.W.2d at 733 ("[W]e must remand the entire community estate for a new division."). "[I]f the claims belong to the community, they are to be addressed via the trial court's duty to make a just and right division of that estate. If they are separate property, then they remain not only the spouse's but also susceptible to prosecution by the spouse after divorce." *Kite v. King*, 492 S.W.3d 468, 475 (Tex. App.—Amarillo 2016, no pet.); *Chu*, 249 S.W.3d at 444 ("Waste, fraudulent transfer, or other damage to community property are claims belonging to the community itself"); *Osborn*, 961 S.W.2d at 415 ("On remand, the trial court is required to properly characterize the damages sought by the personal injury

25

lawsuit . . . . [T]he damages for [the wife's] claim for loss of consortium are her separate property."). We sustain Kelly's first issue.

## V. MOTION TO STRIKE

By her third issue, Kelly argues the trial court abused its discretion by striking her expert witness as to business valuation, John Camp, because he failed to appear at a deposition. Kelly states that "Camp was ill [with COVID] and could not be deposed on August 1, 2022." Kelly further states that "the information central to his valuation was all contained within his report," which was provided to Andrew. Andrew counters that the trial court did not err because Kelly "failed to timely designate her expert," and "failed to provide the documents on which the expert relied."

## A. Pertinent Procedural History

The following timeline of events transpired at the trial court:

- **May 16, 2022.** Kelly filed a third supplemental response to Andrew's request for disclosure and designated Camp as an expert witness as a testifying valuation expert.

- **June 24, 2022.** Andrew served a notice of his intent to take Camp's deposition with a request for production of documents. The deposition was noticed for August 1, 2022, at 12:00 p.m. at Camp's office in Houston. Andrew filed a subpoena duces tecum, instructing Camp to produce relevant documents by July 29, 2022.

- **June 30, 2022.** The trial court set a jury trial for August 15, 2022, with jury selection to occur on August 12, 2022, followed by opening statements on the same date.

- **July 14, 2022.** Kelly supplemented her first set of requests for production and produced documents for the first time.

- **July 20, 2022.** The trial court instructed the parties to provide "whatever your expert[s] relied upon to come to [their] conclusions" at least one week before their scheduled depositions and stated:

  > If there are things that either expert relied on that you all did not provide to the other side, then it will be very likely that I will strike that expert's testimony and not allow him to testify at trial. So if you are hiding the ball in any way, shape or form, it's going to go against you . . . . [M]ake sure that whatever documents that your expert relied on, all documents, were provided to the other side at least a week before that deposition. Because if not, and it comes out that they relied on documents that were not provided to the other side, then they will most likely have their testimony stricken and not be allowed to testify at trial . . . . whatever documents they relied upon to come up with their opinion is fair game for both sides . . . . If they don't provide you any information that their expert relied on, then their expert's testimony will most likely be stricken as they're required . . . . Both ways . . . . I want each side to have it at least a week before the other party's deposition.

- **July 29, 2022.** Kelly filed an eighth supplemental response to Andrew's request for disclosure and added Camp as a testifying expert for the first time regarding tracing of community funds. Andrew filed a motion to suppress Kelly's produced items as being untimely and a motion for

27

sanctions, citing Rules of Civil Procedure 193.5 and 215, stating that Kelly had supplemented her response for production of documents less than thirty days before trial.

- **July 30, 2022.** Kelly notified Andrew that Camp testified positive for COVID and would have to be deposed via Zoom on August 1.

- **August 1, 2022.** Kelly filed a motion to quash Camp's deposition and a motion for protective order on Andrew's subpoena duces tecum, stating that Camp's COVID symptoms had worsened. Kelly stated Camp's deposition would have to be rescheduled.

- **August 4, 2022.** Kelly responded to Andrew's motion to suppress and motion for sanctions, asserting that her supplements were timely because the jury trial was set for August 15, 2022. According to Kelly, trial starts when the party with the burden of proof presents its case, and, accordingly, she has shown "good cause" as she believed discovery was timely up until thirty days before the presentation of evidence—not thirty days before jury selection.

The trial court held a hearing. Kelly informed the trial court that Camp did not appear for his scheduled deposition because he had fallen ill with COVID and would be available for deposition the following week. Andrew stated that it was impossible to depose Camp the next week and obtain the transcript in time to prepare for the jury trial, which was scheduled to begin

28

the following week. He informed the trial court that he still did not have the necessary documents from Kelly that Camp relied on in forming his opinion.

- **August 8, 2022**. Andrew filed a motion in limine requesting the trial court to suppress any evidence Kelly did not properly disclosure pursuant to Texas Rules of Civil Procedure 193.6. Andrew further requested that the trial court not allow any opinions or expert testimony from Camp as his report was not timely produced, and he failed to show up to his scheduled deposition.

- **August 9, 2022.** Kelly served her tenth supplemental responses to Andrew's request for disclosure. Andrew filed a motion to strike Kelly's tenth supplemental responses. Andrew argued that the discovery deadline was July 15, 2022, and that Kelly's failure to comply with the strict deadline required the trial court to strike her responses.

- **August 10, 2022.** Kelly responded to Andrew's motion in limine, asserting that she did not raise new causes of action or allegations such as would act as a surprise or prejudice to Andrew. According to Kelly, Camp's "report was emailed to [Andrew] at 5:55 p.m. on August 1, 2022." Kelly further asserted that Camp did not appear for a deposition because he was ill with COVID but that he was available via Zoom the following week, so Andrew's motion in limine should be denied.

- **August 11, 2022.** Andrew filed a motion to strike Camp as an expert witness, pursuant to Texas Civil Procedure Rules 195.3, 215.1(b)(2), (d),

29

215.2(b), 215.3, arguing that he was unable to take Camp's deposition, that Kelly failed to provide deposition dates for him, and that Kelly did not timely produce Camp's expert report. According to Andrew, his counsel appeared at Camp's office ready to take Camp's deposition as scheduled but was "locked out and not allowed inside the office." Kelly responded, asserting Camp would have been available via Zoom had Andrew not insisted on the deposition being live. Kelly acknowledged that she did not timely file Camp's expert report but explained that counsel was "participating in another case's contested hearing" at that time. Lastly, Kelly claimed that she provided Andrew with deposition times for Camp to be deposed but that Andrew "declined."

On August 12, 2022, jury selection was set to begin. Right before jury selection, Andrew filed a motion for death penalty sanctions as a result of Kelly's alleged discovery abuse. In the motion, Andrew asserted that while jury selection was scheduled to occur that very morning, Kelly had filed a sworn inventory and appraisement with exhibits, which she was ordered to produce by June 13, 2022. Andrew asserted that Kelly "has attempted to supplement a myriad of discovery response[s] on the eve of trial."

The trial court held a hearing on Andrew's motion to strike Camp's testimony, motions for sanctions, and motion to strike Kelly's pleadings. At the hearing, the parties argued extensively regarding Kelly's alleged failure to produce relevant documents and her alleged failure to comply with discovery. The trial court granted Andrew's August 11, 2022 motion to strike Camp's testimony. The trial court did not rule on Andrew's motion

for death penalty sanctions and motion to strike Kelly's pleadings. Kelly's counsel asked the trial court to explain its ruling, and it responded:

> It's everything. Everything leading up to it. The preparation, the—me telling you, you need to get this done, giving you plenty of advance notice to get all these documents exchanged ahead of time, the fact that you didn't get it to them at least seven days before the scheduled deposition even though it got canceled, and then the fact that they were provided with just reference. It's too global.

The trial court also granted Andrew's motion in limine and instructed counsel not to refer documents not properly produced as required by Rules of Civil Procedure 193.5 and 193.6.

On August 15, 2022, on the first day of jury testimony, Kelly filed Camp's evaluation report with attached exhibits. Kelly attached this evaluation report to her third supplemental response to Andrew's requests for disclosure. The disclosure provides that Camp would be testifying regarding the excessive spending of Tex-Mex, the reconstitution of the community estate related to constructive fraud and waste, and that Camp was provided with accounting software and documents.

Andrew filed a notice in support of his motion to strike Camp (which the trial court already orally granted on August 12, 2022). He attached numerous documents referencing Kelly's late filings and Camp's failed deposition. Andrew attached Kelly's ninth supplemental response, filed on July 29, 2022, which did not state that Camp would be providing expert testimony concerning changes in his opinion of Tex-Mex's value. The ninth disclosure also included only limited documents that Camp relied on in forming his opinion. According to Andrew, because Kelly's filed her tenth supplemental discovery too late, Camp's report and testimony should be struck.

31

Kelly filed a motion to reconsider the trial court's striking of Camp. Kelly suggested that if the trial court found she did not timely produce Camp's expert documentation, then the trial court should strike Andrew's expert, too, as he also did not timely comply with the trial court's orders. In her motion, Kelly emphasized that Camp did not appear for his deposition due to COVID. Kelly stated that Andrew was provided with the documentation reviewed by Camp as early as May 16, 2022, and added that the "only additional documentation reviewed by [Camp] was" an "ATKG valuation report"[11]; documents that were untimely produced by Andrew on July 25, 2022; Michael Brown's expert report; and "general industry source materials." Kelly further stated that it was impossible to produce the documentation "based on the time[]line" and that exclusion of expert testimony is a an extreme remedy.

The trial court held another hearing. At the hearing, Andrew argued that the trial court should deny Kelly's motion to reconsider because she did "properly disclose [Camp]." Andrew maintained that Kelly had not produced the documentation that Camp relied on even though the trial court "gave them extra time [of] sixty days to do it; and then another thirty, and then another thirty. They've had all this time. And then as we were there picking a jury, we found out that they still hadn't produced—to that date—her expert report." Kelly argued that for the trial court to strike Camp based "on a document production issue," but to allow Andrew's expert to testify "when [Andrew] violated your order" would be "grossly unfair."

---

[11] ATKG is an accounting firm. *See* ATKG Advisors, Inc., https://atkg.com (last visited May 27, 2025).

Camp testified regarding the basis for forming his opinion and the documents he relied on. The trial court denied Kelly's motion to reconsider.

## B.    Applicable Law

Texas Rule of Civil Procedure 195 makes its permissible discovery tools the exclusive means by which a party may obtain information concerning testifying experts. *See* TEX. R. CIV. P. 195.1 ("A party may obtain information concerning testifying expert witnesses only through disclosure under this rule and through depositions and reports as permitted by this rule." (emphasis added)). A party's duty to amend and supplement written discovery regarding a testifying expert is governed by Rule 193.5. TEX. R. CIV. P. 195.6. "If a party learns that its written discovery responses regarding a testifying expert were or have become incomplete or incorrect, the party must supplement the response, unless the additional or corrective information has been made known to the other parties." *Kingsley Props., LP v. San Jacinto Title Servs. of Corpus Christi, LLC*, 501 S.W.3d 344, 353 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.) (citing TEX. R. CIV. P. 193.5).

Texas Rule of Civil Procedure 195.3 provides that if an expert's report is not produced when the expert is designated, as is the case here, "the party must make the expert available for deposition reasonably promptly after the expert is designated." TEX. R. CIV. P. 195.3; *In re First Transit Inc.*, 499 S.W.3d 584, 594 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("It is presumed that a supplemental response made less than 30 days before trial was not made reasonably promptly.") (citing TEX. R. CIV. P. 193.5).

Rule 193.6 relates to the exclusion of evidence that is not timely disclosed (a topic the parties vehemently argued at several hearings). *See* TEX. R. CIV. P. 193.6. "Under Rule 193.6, a party may not offer testimony from a witness that was not timely identified

unless the trial court finds that (1) there was good cause for the failure or (2) the failure 'will not unfairly surprise or unfairly prejudice the other parties.'" *Jackson v. Takara*, 675 S.W.3d 1, 6 (Tex. 2023) (citing TEX. R. CIV. P. 193.6(a)). "The rule is mandatory, and the penalty—exclusion of evidence—is automatic, absent a showing of: (1) good cause or (2) lack of unfair surprise or (3) unfair prejudice." *In re Staff Care, Inc.*, 422 S.W.3d 876, 882 (Tex. App.—Dallas 2014, no pet.). The burden of proof to establish good cause or the lack of unfair surprise or unfair prejudice is on the party seeking to introduce the evidence or call the witness. TEX. R. CIV. P. 193.6. "A finding of good cause or of the lack of unfair surprise or unfair prejudice must be supported by the record." *Id.* We review a trial court's decision under Rule 193.6(a) for abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005).

A party may ask the trial court to award sanctions for a discovery violation under Texas Rule of Civil Procedure 215. *See* TEX. R. CIV. P. 215. "Rule 215 generally leaves sanctions to the sound discretion of the trial court." *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 884 (Tex. 2017); *see TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991). A trial court has broad discretion to impose sanctions on recalcitrant litigants. *Altesse Healthcare Sols. v. Wilson*, 540 S.W.3d 570, 572 (Tex. 2018) (per curiam). A trial court abuses its discretion if it acts "without reference to any guiding rules or principles." *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985)). Its judgment should be reversed only if the ruling was arbitrary or unreasonable. *Id.*

The imposition of sanctions must be just. *See* TEX. R. CIV. P. 215(b)(2); *see also De Los Santos v. Johnson*, No. 13-07-502-CV, 2008 WL 3971455, at *3 (Tex. App.—

34

Corpus Christi–Edinburg Aug. 28, 2008, pet. denied) (mem. op.) ("Although the choice is left to the sound discretion of the trial judge, the sanctions imposed must be just."). To determine whether an award of sanctions is just, we consider whether there is a "direct relationship" between the abusive conduct and the sanction imposed and whether the sanction is excessive. *In re Nat'l Lloyds Ins.*, 507 S.W.3d 219, 226 (Tex. 2016) (orig. proceeding) (per curiam); *see also In re Ruiz*, No. 13-23-00048-CV, 2023 WL 5090052, at *10 (Tex. App.—Corpus Christi–Edinburg Aug. 8, 2023, no pet.) (mem. op.). The sanction "must further one [of] the recognized purposes of discovery sanctions." *Acadia*, 520 S.W.3d at 884. The purposes of discovery sanctions are to secure the parties' compliance with discovery rules, deter future violation of discovery rules, and punish parties for violation of discovery rules. *See Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex. 1986) (per curiam).

## C.     Analysis

The record provides that on August 12, 2022, Kelly filed a sworn inventory and appraisement with exhibits, which she had been ordered to produce by June 13, 2022. At the motion to strike hearing, Andrew argued that Kelly failed to produce "all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of [his] testimony," as required by the rules. *See* TEX. R. CIV. P. 195.5(a)(4)(A). Andrew clarified that he provided Kelly with a Dropbox link and thumb drive; still, Kelly did not product the relevant documents.[12]

---

[12] Andrew's counsel continued:

> And, Judge, that's completely inappropriate. He was not designated timely. He was late-designat[ed]. The Court allowed them to. We were willing to go forward if we got his deposition—to go forward and just, okay, we'll take his deposition. We'll see what his opinions are and go forward. But then when they didn't produce the

Kelly did not dispute that she did not provide Andrew with the documents. Instead, she argued that Andrew would:

> get the duces tecum documents at the time the deposition begins, and he never took the deposition . . . . Since he didn't take the deposition, he doesn't get them . . . . And if the Court doesn't want us to use our latest inventory and appraisement that's the most the Court can do.

In this regard, Andrew complained to the trial court that he had not been provided with "all the exhibits, all the attachments," and that Kelly had "changed everything." The trial court inquired whether the supplementation and exhibits had changed, and Kelly stated "[i]n the last thirty days. Yes." Andrew argued that "not a shred" of the materials Camp relied on for his expert opinion was provided to him.

On August 15, 2022, Kelly filed a "Designation of John Camp" along with her third supplemental response to requests for disclosure. *See Kingsley*, 501 S.W.3d at 354 (finding that the trial court did not abuse its discretion in striking the expert because it was "evident" that it acted in accordance with the guiding principle of Rule 195.6, "which provides that a party must supplement incomplete deposition testimony by a retained expert with regard to the bases of his opinions" and Kingsley "failed to supplement the incomplete basis of [the expert's] opinions"). Thus, even while trial was set to begin, Kelly still had not supplemented discovery with the relevant documents. *See Duerr v. Brown*, 262 S.W.3d 63, 76 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("The failure to provide

---

documents up there, that's one thing. Then when they didn't supplement the Request for Disclosure—to this date—jury selection today in a couple of hours, still haven't supplemented the Request for Disclosure. That's mandatory, so he needs to be stricken . . . . It was the other thing about all the late filings, the late designations, the late documents . . . . The day of jury selection is when she now files two more motions . . . . This is discovery abuse.

expert information as required by the rules is sanctionable by exclusion of that expert's report."). Accordingly, Kelly's response was untimely. *See* TEX. R. CIV. P. 193.5 (providing that except as otherwise provided by these rules, it is presumed that an amended or supplemental response "made less than 30 days before trial was not made reasonably promptly"); *see also Kingsley*, 501 S.W.3d at 353 ("The duty to supplement 'require[s] that opposing parties have sufficient information about an expert's opinion to prepare a rebuttal with their own experts and cross-examination, and that they be promptly and fully advised when further developments have rendered past information incorrect or misleading.'" (citation omitted)). According to Kelly, Andrew was not entitled to the documents because he chose not to depose Camp despite the discovery rule requirements and the trial court's prior orders. Kelly's position conflicts with the rules of civil procedure, which require a party seeking affirmative relief to make her retained experts available for deposition, allows for the exclusion of discovery if the party does not timely provide it, and requires supplementation of discovery. *See* TEX. R. CIV. P. 193.5, 193.6, 195.3; 195.5, 215.1; *see also Franke*, 2019 WL 2220112, at *3 ("Were the law as Franke advocates, an expert whose testimony is essential to a litigant's case could never be stricken or excluded, no matter how prolonged the expert's refusal to cooperate in discovery, regardless of the egregiousness of counsel's disregard of the discovery rules, and heedless of the number of times that the trial court ordered the expert's deposition to go forward."). We conclude the record between the sanction and the conduct is clear, there is no showing of good cause or lack of unfair surprise or prejudice on Kelly's behalf as the trial court found that Kelly had possession of the relevant the documents and still

37

failed to produce them,[13] and the striking of Camp is "specifically related to the harm done by the condemned conduct." *See* TEX. R. CIV. P. 193.6; *Acadia*, 520 S.W.3d at 884.

The extent of Kelly's argument regarding this ruling is the following: "The striking of Camp fails the first prong. Camp was ill and could not attend his deposition. This was not Kelly's fault or her counsel's fault. Neither were offenders." Kelly does not address the failure to supplement discovery—the crux of the parties' arguments to the trial court. The record provides that Kelly violated the trial court's prior orders and supplemented discovery on August 12 and August 15—the day of the commencement of trial.

Next, we consider whether the trial court's sanctions were unjust and excessive. *See In re Nat'l Lloyds Ins.*, 507 S.W.3d at 226. Here, the record provides that the trial court considered less stringent measures before setting the sanction. *Cf. Spohn Hosp.*, 104 S.W.3d at 882 (noting the trial court's sanctions were unjust and excessive because "the record is silent regarding the consideration and effectiveness of less stringent sanctions"). Prior to striking Camp, the trial court warned the parties:

> If there are things that either expert relied on that you did not provide to the other side, then it will be very likely I will strike that expert's testimony and not allow them to testify at trial. So if you're hiding the ball in any way, shape, or form, it's gonna go against you . . . . Then you make sure that whatever documents that your [expert] relied on, all documents, were provided to the other side at least a week before that deposition.

Admonishments like these, which compel discovery and threaten harsher sanctions for noncompliance, qualify as lesser sanctions. *See Cire*, 134 S.W.3d at 840; *see also Weinberger v. Longer*, 222 S.W.3d 557, 571 (Tex. App.—Houston [14th Dist.] 2007, pet.

---

[13] Counsel hid behind the duces tecum for a deposition she cancelled and with documents she was duty-bout and obligated to produce in discovery pursuant to the rules and the trial court's orders.

denied) (rejecting argument that trial court didn't first impose lesser sanctions given that it twice ordered compliance with discovery requests); *Franke v. Palau*, No. 01-18-00424-CV, 2019 WL 2220112, at *3 (Tex. App.—Houston [1st Dist.] May 23, 2019, no pet.) (mem. op.) ("Orders like these, which compel discovery and threaten harsher sanctions for noncompliance, qualify as lesser sanctions."). Additionally, the trial court considered the option of allowing Andrew to depose Camp the next day, Kelly overnighting the transcripts for Andrew to review on a Sunday—even though trial was set to begin on Monday. However, this option was not feasible because Andrew had still not received the documents that Camp relied on, so the trial court could have found that a deposition the very next day would be futile.[14] *See Alma Invs., Inc. v. Bahia Mar Co-Owners Ass'n.*, 497 S.W.3d 137, 143 (Tex. App.—Corpus Christi–Edinburg 2016, pet. denied) ("In its sanctions order, the trial court noted that it considered lesser sanctions, but concluded that such lesser sanctions would have been ineffective.").

In sum, it is evident that the trial court acted in accordance with the guiding principles of Texas Rules Civil Procedure Rules 193.5, 195.3, and 193.6. Because Camp was not deposed and discovery was not promptly produced, we find the trial court did not abuse its discretion in striking Camp. *See id.* ("Stated another way, 'The punishment should fit the crime.'"); *De Los Santos*, 2008 WL 3971455, at *4 ("The trial court's order enumerates numerous and specific incidents of discovery abuse, including violations of

---

[14] Before deposing Camp the very next day as the trial court suggested, Andrew clarified that he would have to obtain Camp's documents first, then review them, and then go over those documents with his expert. According to Andrew, this would take him at least seven days.

the trial court's prior orders and giving false answers to discovery."). We overrule Kelly's third issue.[15]

## VI. CONCLUSION

We reverse the judgment on the IIED claim, and we render judgment that Kelly take nothing on that claim. We reverse the trial court's order of child support, and we remand the case for recalculation of child support consistent with the memorandum opinion. We reverse that portion of the judgment dividing the community property and remand it for a new just and right division of property. We affirm the trial court's judgment in all other respects.

JAIME TIJERINA
Chief Justice

Delivered and filed on the
18th day of June, 2025.

---

[15] In her reply brief, Kelly argues that the trial court erred by imposing a death penalty sanction. However, Kelly did not address this issue in her cross-appellate brief and did not argue how the trial court's sanction amounted to a death penalty sanction. Accordingly, we will not address whether the trial court's striking of Camp amounted to a death penalty sanction. *See Howell v. Tex. Workers' Comp. Comm'n*, 143 S.W.3d 416, 439 (Tex. App.—Austin 2004, pet. denied) ("The rules of appellate procedure do not allow an appellant to include in a reply brief a new issue in response to some matter pointed out in the appellee's brief but not raised by appellant's original brief.").